VICKI LANDERS, Wife and Administrator of the Estate of Charles Landers, Deceased, Plaintiff-Appellee and Cross-Appellant, v. SURIT GHOSH, Defendant-Appellant and Cross-Appellee (Jaime Inawat *et al.*, Defendants and Cross-Appellees).

Fifth District   No. 5—84—0759

Opinion filed April 15, 1986.

Robert Schmieder, of Wagner, Bertrand, Bauman & Schmieder, of Belleville, for appellant.

John J. Kurowski, P.C., Angelia Blackman-Donovan, and James J. Gomric, P.C., all of Belleville, for appellee Vicki Landers.

A. J. Nester and Carole M. Hummel, both of Belleville, for appellee Centreville Hospital.

R. W. Wilson and Michael Reda, both of Evans & Dixon, of Edwardsville, for appellee Jaime Inawat.

JUSTICE JONES delivered the opinion of the court:

The plaintiff, Vicki Landers, as the wife of Charles Landers, deceased, and the administrator of his estate, brought suit in negligence against Surit Ghosh, M.D., Jaime Inawat, M.D., and Centreville Hospital, a municipal corporation, hereafter referred to as Centreville, alleging the medical malpractice of each defendant. At the close of the plaintiff's case in chief, the trial court granted Centreville's motion for a directed verdict in its favor. The jury returned a verdict in favor of the plaintiff against Dr. Ghosh in the amount of $400,000 and a verdict in favor of Dr. Inawat against the plaintiff. Dr. Ghosh has appealed, and the plaintiff has cross-appealed. Dr. Ghosh presents three issues for review: (1) whether the trial court erred in directing a verdict for Centreville at the close of the plaintiff's case; (2) whether the trial court erred in refusing to admit the expert opinion of Dr. Harry Parks as to the reparability of the decedent's injuries; and (3) whether the trial court erred in refusing to allow Dr. Ghosh to reopen his case to introduce certain surgical records or, in the alternative, in allowing Dr. Inawat's counsel to comment during closing argument on the absence of such records from evidence. In her cross-appeal the plaintiff presents three issues for review: (1) whether the damages awarded to her were inadequate as a matter of law; (2) whether the trial court erred in granting a directed verdict in favor of Centreville; and (3) whether the jury verdict in favor of Dr. Inawat was against the manifest weight of the evidence.

On the day of his death, August 5, 1979, the 22-year-old decedent, a resident of Arkansas, was traveling with his wife and two-year-old son when he stopped at a filling station in Cahokia, Illinois, and, while there, was shot in the neck. He was brought to Centreville's emergency room for treatment, arriving there at 11:20 a.m., where Dr. Inawat stabilized him and at about 11:50 a.m. called Dr. Ghosh, the surgeon "on call" that day to treat such injuries. Dr. Ghosh accepted Charles Landers as a patient but was unable to proceed directly to Centreville because he was about to perform surgery at St. Elizabeth's Hospital in Granite City. The evidence was much disputed as to whether Dr. Ghosh had apprised Dr. Inawat that he was about to perform surgery at St. Elizabeth's Hospital. Dr. Ghosh maintained that he had done so or had told the emergency room nurse of this fact, whereas Dr. Inawat maintained that Dr. Ghosh had not but had merely indicated that he would be "tied up" there. Dr. Inawat testified that he had anticipated Dr. Ghosh's arrival at Centreville in about half an hour. Nursing personnel testified that they had known that Dr. Ghosh was "tied up" but had not known what he was doing. Dr.

Ghosh ordered Charles Landers admitted to Centreville's intensive care unit, where the patient arrived at about 12:15 p.m. At about 1:30 p.m. Dr. Ghosh called Centreville and spoke with a nurse, Ella Ross, in the intensive care unit concerning Charles Landers' condition. She told him what the patient's vital signs were and advised him that the right side of his neck was edematous, or swollen, that he had been coughing up blood clots, as he had done in the emergency room, that his condition appeared to be stable, and that he was having no problem with respiration. Dr. Ghosh stated that he would be there shortly and arrived at Centreville at approximately 2:45 p.m. Upon examining the patient he observed signs of developing respiratory distress, whereupon he performed a tracheotomy on the patient in the intensive care unit at about 3:15 p.m. The evidence was disputed as to whether Dr. Ghosh completed the tracheotomy. Either during the procedure or shortly after it was completed, Charles Landers began hemorrhaging and expired despite efforts to save his life. Autopsy revealed that the bullet had severed his right carotid artery and right jugular vein and had damaged the wall of the hypopharynx. Having reviewed the report of the pathologist, Dr. Parks, the plaintiff's expert, Dr. Raymond Keltner, testified that all of the decedent's wounds had been reparable, whereas Dr. Wallas Berkowitz testified for Dr. Ghosh that the patient's injuries were not reparable. Dr. Keltner testified to the inappropriateness of a tracheotomy prior to surgery, as opposed to endotracheal intubation, in the case of a penetrating neck wound, whereas Dr. Berkowitz and Dr. Lloyd Thompson, also called by Dr. Ghosh, testified to the appropriateness of tracheotomy rather than endotracheal intubation in such cases. Believing that tracheotomy was the proper procedure to be performed and that necessary coughing on the part of the patient during the procedure had dislodged a clot over the transected vessels whereupon hemorrhage had ensued, Dr. Thompson, unlike Dr. Keltner, believed that the patient would not have lived had no delay in surgical treatment of the patient occurred since the blood vessels involved were major ones and had been completely transected by the bullet. Inasmuch as Dr. Berkowitz believed that the patient's injuries were not reparable, like Dr. Thompson, he was of the opinion that delay in the surgical treatment of Charles Landers had not been a cause of his demise.

With respect to the first issue Dr. Ghosh raises, whether the trial court erred in directing a verdict for Centreville at the close of plaintiff's case in chief, he argues in reliance upon *dictum* in *Bothun v. Wallace* (1978), 61 Ill. App. 3d 365, 377 N.E.2d 1054, that

"[u]pon a motion for a directed verdict in a multidefendant

case, if the trial court believes that a verdict should be directed in favor of fewer than all defendants, the court always has a choice. It can direct a verdict for the one defendant, or it can wait until after the jury returns and grant a judgment n.o.v. if the jury returns a verdict against that defendant. This discretion should be exercised with great care and only such that it will not result in prejudice to the remaining defendants."

In *Bothun* the court commented:

"The second issue raised by the defendant is whether the trial court erred by denying his motion for a mistrial after his co-defendant was directed out of the suit at the close of the plaintiff's evidence. Although we need not now decide this issue, we believe the better procedure in the trial court would be to avoid any possible prejudice to the defendant by reserving its ruling on the directed verdict until after the jury returns its verdict and then granting a judgment *n.o.v.* to the appropriate defendant. Otherwise, a jury, having observed two defendants during part of the trial and observing that only one defendant remains, could infer that, were the remaining defendant not liable, the trial judge would also have released him. It is irrelevant whether the directed verdict in favor of the other defendant is proper or improper for the prejudice to the remaining defendant exists in either case. The action of the trial court here may have resulted in prejudice to this defendant, but any prejudice which may result from this type of action by the trial court could, and should, be avoided in the future." (61 Ill. App. 3d 365, 367-68, 377 N.E.2d 1054, 1055-56.)

Dr. Ghosh maintains that the court's directing a verdict for Centreville unfairly prejudiced him, arguing that the record supported a verdict against Centreville and that the directed verdict for Centreville was "tantamount to directing a verdict against Dr. Ghosh" if the jury believed that the delay in the performance of surgery upon Charles Landers was in part a cause of his death.

■■ On the basis principally of *Tisoncik v. Szczepankiewicz* (1983), 113 Ill. App. 3d 240, 446 N.E.2d 1271, and *Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939, the plaintiff responds, we think correctly, that Dr. Ghosh lacks standing to challenge the directed verdict against Centreville. In *Tisoncik* the plaintiff had brought a personal injury action against the owner-lessor, the lessee, and the driver of a truck that collided with the plaintiff's car. At the close of the evidence the owner-lessor was granted a directed verdict in its favor, and the driver was dismissed at the plaintiff's request. The jury awarded dam-

ages against the lessee, who was the only defendant remaining. The lessee appealed from the verdict against it and the dismissal of the co-defendants, arguing that the potential *res judicata* effect of the owner-lessor's dismissal on a possible contribution action by the lessee against the owner-lessor gave the lessee standing to appeal, despite the general rule in Illinois that the only party who may appeal from a directed verdict in favor of a codefendant is the plaintiff (*Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 392 N.E.2d 77; *Schachtrup v. Hensel* (1938), 295 Ill. App. 303, 14 N.E.2d 897). The court in *Tisoncik* held that because the lessee had not asserted a counterclaim for contribution in the pending action in the trial court, as provided by section 5 of "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1981, ch. 70, par. 305) (hereafter referred to as the Contribution Act), it lacked standing to appeal the dismissal of its codefendants. Section 5 of the Contribution Act provided then, as it does now (Ill. Rev. Stat. 1985, ch. 70, par 305), that "[a] cause of action for contribution among joint tortfeasors may be asserted by a separate action before or after payment, by counterclaim or by third-party complaint in a pending action." The court interpreted section 5 as providing that when there is a pending action initiated by the injured party, a contribution claim should be asserted by counterclaim or by third-party claim in the pending action. In *Laue* the Supreme Court of Illinois subsequently interpreted section 5 of the Contribution Act as did the court in *Tisoncik*. The record shows that Dr. Ghosh asserted no claim of any kind against Centreville in this litigation. Since the only party who may appeal from a judgment entered in a directed verdict in favor of a codefendant is the plaintiff and Dr. Ghosh did not litigate a claim of contribution, for example, or any other claim against Centreville in the trial court, he lacks standing to appeal the directed verdict against his codefendant Centreville. Inasmuch as the plaintiff has cross-appealed raising the question of whether the trial court erred in granting a directed verdict for Centreville, we consider that issue below. However, in view of Dr. Ghosh's lack of standing to appeal the directed verdict against his co-defendant, we do not consider whether it was error for the trial court to have granted the directed verdict for Centreville when it did.

██ Concerning the second issue Dr. Ghosh raises, whether the trial court erred in refusing to admit the expert opinion of the pathologist, Dr. Parks, as to the reparability of the decedent's injuries, the record shows that in a letter dated August 14, 1981, Dr. Parks, who had performed the autopsy on the deceased, described the path of the bullet and the damage it had caused. In the letter he stated further:

"I might add that an injury of this magnitude in this part of the neck which is richly supplied with large blood vessels as you can see from the diagram [attached] would pose an almost insurmountable, if not impossible, surgical problem because of hemorrhage and shock and obstruction of the airway with blood leading to cerebral hypoxia."

Apparently because of a subsequent statement, not included in the record, made by Dr. Parks in a discovery deposition to the effect that he was not qualified to testify regarding the reparability of Charles Landers' injuries, the plaintiff objected to testimony by him at trial on that subject. Since counsel disagreed on the matter of Dr. Parks' qualifications to testify on the reparability of the decedent's wounds, the trial court interjected by saying, "Let me suggest—this may be the best way to resolve all of that, just to have a little incamera [sic] examination on whether or not he thinks he is qualified to." The court added, "Then he can say whether or not he feels he is qualified. If he says he is, well he is and if he feels he is not, then he is not," and explained, "For him to be able to testify I think as an expert on an opinion on a matter such as this I think he would have to be an expert and if he doesn't feel he is an expert then it is no different if the guy would have survived the operation from a layman."

Dr. Parks was examined *in camera* as follows:

"MR. GOMRIC [counsel for plaintiff]: *** [D]octor, in your deposition we were asking you about the extent of the reparability of injury, if you recall, and if you were asked those questions today about the extent of reparability, whether or not the artery or the vein or the trachea could have been repaired, would your answer be that you feel capable of expressing an opinion in regard to capability or would you defer to an expert, a surgical expert.

DOCTOR PARKS: Well, if the surgical expert saw the wound, I would have to defer to him on his judgment whether the wound could be repaired or not.

MR. SCHMEIDER [counsel for Dr. Ghosh]: But doctor, do you feel that you are qualified to express an opinion as to whether or not this wound from what you see based upon your experience was reparable and whether or not the man could be saved.

DR. PARKS: Well, my impression at the time of the autopsy was, as I said here, I wasn't at all surprised that the patient didn't survive. I have seen a number of cases with similar wounds in which the major artery is damaged by a bullet and

the patient bleeds to death within a couple hours so I think, you know, where I said here when the time that elapsed between his arrival and death was sufficient to carry out all the procedures that might have to be done in a case like this, I was implying at least that is a lot to do preparing and performing surgery in a case like this, it might not get all done in a couple hours but I am afraid none of the surgeons saw the wound and they might feel that it was reparable when they would see it. I was impressed by the severity of the damage to the carotid artery.

MR. GOMRIC: Do you, doctor, feel qualified to pass judgment on whether or not the wounds are reparable.

DR. PARKS: No, I don't think I am qualified to say that one wound is reparable and another isn't reparable. I think that is a field for surgical judgment over surgical opinion.

THE COURT: Okay. That is fine, doctor. Thank you. Anything else?

THE COURT: I will grant the plaintiff's motion barring any suggestion to the doctor as to the reparability of the damage that the plaintiff [*sic*] suffered since he doesn't feel qualified to render such an opinion.

MR. WILSON [counsel for Dr. Inawat]: Judge, for the record, I think his answers were that he feels that it would be better if a surgeon made a judgment on that than him but I don't think he said that he wasn't capable of doing it due to the amount of damage but the court heard the record too.

MR. SCHMEIDER: And again, Your Honor, what Doctor Parks has testified here be [*sic*] considered an offer of proof?

THE COURT: Yes, certainly."

In his brief Dr. Ghosh argues that

"[t]he determinative question should have been whether Dr. Parks had the requisite knowledge to render this opinion.

The trial court based its decision not to admit Dr. Parks' opinion on the doctor's supposed 'admission' that he was not qualified. However, Dr. Parks' statements on the reparability of the wounds must not be taken out of context. As is evidenced by the entire transcript, what Dr. Parks meant by this 'admission' was that he *would not dispute the conclusion reached by a surgeon who had examined Mr. Landers' wounds first-hand while he was in Centreville.* \*\*\* He was *not* admitting that he lacked the requisite knowledge to make a decision as to the reparability."

The plaintiff states in her brief that "Dr. Parks' denial of his qualification to give the desired opinion was unequivocal." Both Dr. Ghosh and the plaintiff rely upon the proposition that in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13.) However, once the fact of such license has been established, it lies within the sound discretion of the trial court to decide whether the witness is qualified to testify as an expert regarding the standard of care. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13.) As the record shows, Dr. Parks did imply initially that had the surgical expert not seen the wound, the witness would not feel that he should defer to the surgical expert as to whether the wound could have been repaired. However, at the conclusion of the examination of the witness in this matter, he stated that he did not think he was qualified to say that one wound was reparable and another not. The trial court expressly concluded that the witness did not feel he was qualified to render such an opinion. Under the circumstances we cannot say that the trial court abused its discretion in reaching such a conclusion and, therefore, in barring Dr. Parks' testimony concerning his opinion as to the reparability of Charles Landers' wounds.

■ We turn to the final issue Dr. Ghosh raises, whether the trial court erred in refusing to allow Dr. Ghosh to reopen his case to introduce his surgical records or, in the alternative, in allowing counsel for Dr. Inawat to comment during closing argument on the absence of such records from evidence. During cross-examination of Dr. Ghosh, who was the final witness to testify in his behalf, counsel for Dr. Inawat inquired about the location of the record of the surgical procedure Dr. Ghosh had performed at St. Elizabeth's Hospital in Granite City after having accepted Charles Landers as a patient and prior to examining him. It was established that the record in question was in the record room at St. Elizabeth's Hospital in Granite City, that Dr. Ghosh had examined the record at one time in response to pretrial questions of, apparently, opposing counsel, and that he had "probably" had a copy of the record but had not brought it to court. The following day Dr. Ghosh sought to reopen his case to introduce the surgical record in question from St. Elizabeth's Hospital. In the alternative he sought a protective order precluding counsel from arguing with regard to the absence of that record. The trial court refused to reopen the case and allowed counsel to argue concerning the absence of the record from evidence. After Dr. Ghosh's closing argument had been concluded, counsel for Dr. Inawat commented during closing ar-

gument as follows on the absence of the record:

"[N]obody claims, I think, by any believable standard that my client knew that Doctor Ghosh would not be there within a reasonably short period of time because we were never told, never once does anybody claim that we were told that this patient would be in surgery, the one over in Granite City.

By the way, you remember a question I asked about that to Doctor Ghosh? If you were in surgery, doctor, where is the record of your surgery in Granite City? It was never produced or brought to you. We have never ever seen a record of such surgery, have we?"

At trial much of the testimony concerning the delay in Dr. Ghosh's arrival at Centreville focused on his conduct in accepting a patient with a penetrating neck wound when he knew he was preparing to operate on another patient in a hospital some distance away. The cross-examination by counsel for Dr. Inawat outlined above and his comment during closing argument quoted here were the only suggestions in all of the testimony, which was extensive, and other argument on the subject of Dr. Ghosh's delay that Dr. Ghosh had not been where he claimed to have been prior to examining and treating Charles Landers. Furthermore, Dr. Ghosh's delay in arriving at Centreville was not the only aspect of his care of Charles Landers called into question by the plaintiff, whose expert, as we indicated above, not only expressed the opinion that Dr. Ghosh's delay in operating upon Charles Landers was a contributing cause of his death but also criticized strongly Dr. Ghosh's performance of a tracheotomy upon a patient with a penetrating injury of the neck. Therefore, if error occurred on the part of the trial court in refusing to allow Dr. Ghosh to reopen his case to introduce the surgical record in question and in allowing counsel to argue concerning its absence from evidence—and we need not make that determination—we think that the outcome of the trial would not have been different in the absence of such error, which was, therefore, harmless.

Concerning the first issue the plaintiff presents for review, whether the damages awarded were inadequate as a matter of law, she contends that "[a]lthough the jury awarded plaintiff what many would consider a substantial sum, it is submitted to be inadequate, principally in light of the recent decision in *Elliott v. Willis,* 92 Ill. 2d 530, 442 N.E.2d 163 (1982)." In *Elliott,* loss of consortium was allowed to be included as an element of damages in wrongful death cases. The plaintiff argues that consideration of this element alone makes the award for damages inadequate and seeks remand for a new

trial solely on the issue of damages. At trial Leroy Grossman, a professor of economics at St. Louis University, testified for the plaintiff concerning damages. The decedent had passed a high school equivalency examination and had had training as a carpenter. The witness assumed the decedent's annual wage increases would have averaged either 6% or 8%, that the discount rate over his working life would be 8½% and that he would have retired at the age of either 66½ or 70. The witness assumed further that the decedent would have consumed 30% of his income and would have earned either the average income of a male high school graduate, which was about $11.40 per hour, or the earnings of a carpenter in the area of Houston, Texas, which were about $12 per hour. With annual wage increases of 6% and retirement at the age of 66½, based on the wages of a high school graduate, the total loss to the family, the witness estimated, would be $411,349. At 8% the loss, by his calculations, would have been $548,327. The witness calculated that the decedent would have provided $1,000 per year in services around the home until the age of 70 for a total of $42,465 if the cost of services increases 6% and $59,025 if the cost of such services increases by 8%. His calculations did not take into account the loss of companionship, guidance, or affection to the decedent's wife and child. On cross-examination, the witness said that he had reduced the decedent's annual earnings by 10% because he had taken off 18% for taxes and added 8% for fringe benefits. He said further that his figures assumed full-time employment. He stated that during the decedent's lifetime, had he lived, there might very well have been a period "when the entire economy's wage increases will not increase." He admitted that everything to which he had testified was "assumed projections." He did not know, he said, whether the statistics for wages that he had used in his calculations took into consideration seasonal occupations. The figures he had used were for full-time workers, and he was not sure "how they treat seasonal workers." The figure he had used for the earnings of a high school graduate was a nationwide figure, rather than a local one, as for Houston, Texas, that might not be affected by changes in the seasons. The witness did not know whether employers regard a GED, which the decedent had obtained, in the same way they do a high school diploma. The witness assumed that the decedent would have been in good health with no disability during the entire period of time he was anticipated to have been in the work force.

Richard Wilkins, a friend and relative of the decedent by marriage, testified that he had gone to vocational school in Arkansas with the decedent, described home improvements made by the decedent,

and indicated that the decedent had had a good relationship with his family. Prior to attending vocational school, the two men had worked in a chicken-processing plant in Arkansas. Apparently while they were in school, he and the decedent had "framed out" two houses together, and prior to the conclusion of the year-long vocational program in June or July of 1979 had built a sundeck and torn down and rebuilt a house. After graduation they had built cabinets in a house, having finished them on the Friday before Charles Landers' death on Sunday. About two years after the decedent's death the witness moved to the area of Houston, Texas, where he was able to make more money than he could in Arkansas. The decedent's wife testified similarly concerning her husband's work and education and described his health as excellent prior to the shooting, stating that he "wasn't a heavy smoker or a heavy drinker." At the time of his death the decedent appears to have been unemployed.

The plaintiff states correctly that generally the question of damages is peculiarly one of fact for the jury and the jury's verdict in determining damages should be approved except where the award is palpably inadequate, a proven element of damages has plainly been ignored, the award is shown to be erroneous or the result of passion or prejudice, or the uncontradicted evidence shows plainly that the amount of the verdict bears no reasonable relationship to the loss the plaintiff has suffered. (*Jumer v. Henneberry* (1978), 61 Ill. App. 3d 422, 377 N.E.2d 1328.) The plaintiff suggests that the amount of the verdict rendered here is adequate to compensate the decedent's wife only for her loss of consortium, "ignoring the other significant elements of damages discussed herein," including the absence of the decedent during the minority of his son, estimated by the plaintiff to be of a value "well in excess of $100,000.00." From the instant record, however, it does not appear either that the jury compensated the decedent's wife solely for her loss of consortium, ignoring the other aspects of damages about which they were instructed, or that the jury awarded damages solely for the lost wages of the decedent. The jury apparently chose, as it was free to do, not to adopt the figures provided by Leroy Grossman, perhaps in part because of the seasonal nature of the occupation the decedent hoped to pursue, the effect of which the witness Grossman had not addressed in his calculations. The jury may have rejected his figures in part because of other considerations explored during cross-examination of him, in part because the decedent apparently was a smoker, or in part because the decedent appears to have been unemployed at the time of his death. Although we cannot know the reasoning of the jury in this regard, the

record here does not support the conclusion that the award is palpably inadequate, that the jury ignored a proven element of damages, that the award was erroneous or the result of passion or prejudice, or that the amount of the verdict bears no reasonable relationship to the loss incurred. The award of damages was not, therefore, inadequate as a matter of law, and we approve the jury's verdict in its determination of damages.

■ With regard to the second issue the plaintiff raises in her cross-appeal, whether the trial court erred in granting a directed verdict in favor of Centreville, she contends that Centreville "had a duty to provide a specialist such as Dr. Ghosh within minutes. When he did not arrive it was incumbent upon it to use the mechanisms they had established for alternate procedures." At trial the plaintiff introduced evidence of the Hospital Licensing Act and requirements applicable in 1979 at the time of Charles Landers' death; the hospital licensing requirements were prepared by the Illinois Department of Public Health, responsible for the administration of the Hospital Licensing Act (Ill. Rev. Stat. 1979, ch. 111½, par. 142 *et seq.*). Section 7–1.1 of the hospital licensing requirements provides in pertinent part concerning comprehensive emergency treatment services: "Physician specialist representing the major specialities, and sub-specialties such as plastic surgery, dermatology, ophthalmology, etc., shall be available within minutes." The plaintiff established that the procedure used in the emergency room for a patient who did not have a physician on the staff at Centreville, as was the case with Charles Landers, was to call the appropriate specialist according to a list of "on call" staff physicians. For each specialist listed for each day an alternate was listed in the event the specialist listed first was unable to treat the patient. Dr. Inawat was providing emergency room services to Centreville pursuant to a contract for such services between Centreville and Spectrum Emergency Care, Inc., which was dismissed as a defendant prior to trial upon the plaintiff's motion for voluntary dismissal without prejudice. On August 5, 1979, Dr. Ghosh was the appropriate specialist on call, was called by Dr. Inawat, and accepted the patient. His alternate was not called. The plaintiff established also the existence of a "chain of command" by which problems concerning a patient's care could be made known to superiors in the event a nurse thought that a doctor was not responding quickly enough or that his response was inappropriate. On direct examination Dr. Keltner testified for the plaintiff as follows in giving his opinion with respect to the conduct of Dr. Inawat:

"Well, the doctor in the emergency room performed greatly

with one minor error. I think his failure to perform to the standard was by my understanding he abandoned the patient. The patient presented to him. It was his responsibility to see that the patient was properly attended and yet he turned it over, the care of a patient, to a surgeon who was miles away, involved in another operation, put the patient in an intensive care unit in the care of nurses and God knows they did a magnificent job of caring for the man. The records are quite clear in that. They were compassionate and kind and they did everything that a nurse could do but the man did not need nursing care, he needed surgical intervening and in my estimate, it was the emergency rooms [sic] physician's responsibility to be certain that that was obtained, to call another surgeon, to have the patient transported by ambulance or helicopter to some location where he could be treated."

On cross-examination, counsel for Centreville asked Dr. Keltner, "You have also said, I believe, that the hospital personnel in the intensive care unit, the ICU, performed well and with empathy?" to which the witness responded, "Yes, I get the impression from the record that they were a very concerned, good group of nurses." He stated further that he thought the emergency room personnel, likewise, had performed well. Asked whether he had an opinion, based upon a reasonable degree of medical certainty, about the performance of the personnel at Centreville, Dr. Keltner answered, "Well, if you are referring specifically to the nursing personnel that would be entering notes in the record, yes, I found no fault with them whatsoever." Asked further whether that opinion applied as well to Centreville's technicians, the witness responded, "I think the service provided by the hospital was as good as could be expected anyplace."

Earl Crawford, the emergency room nurse who testified, stated that when Charles Landers left the emergency room to be admitted to the intensive care unit at about 12:15 p.m. he was in no apparent respiratory distress, there was no marked swelling of his neck, and his condition was stable. The intensive care unit nurse who testified said that she had been informed that Dr. Ghosh would be there as soon as he could, that she had informed Dr. Ghosh of the patient's condition when he called at 1:30 p.m., and that prior to Dr. Ghosh's arrival no problems arose concerning Charles Landers so that there was no need to summon a doctor to provide treatment to him.

At the close of the plaintiff's evidence Centreville moved for a directed verdict in its favor. During argument on the motion and prior to granting the motion the trial court said:

"My point is as I was saying that plaintiff has the burden of proof to show the hospital did not have somebody available. The only thing you have shown is that Dr. Ghosh was contacted and he apparently was unavailable for a period of time but not to say whether or not any other physician on call as a substitute was not available and, therefore, for instance, they couldn't have gotten anybody within X number of hours."

Verdicts should be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Particularly in view of the testimony of plaintiff's expert witness concerning the performance of Centreville's nursing personnel, together with the other evidence adduced by the plaintiff, we conclude in applying the *Pedrick* standard that the trial court properly directed a verdict in favor of Centreville at the close of the plaintiff's case.

■ With respect to the final issue presented for review, whether the jury verdict in favor of Dr. Inawat was against the manifest weight of the evidence, the plaintiff contends that the trial court erred in denying her motion for a directed verdict against Dr. Inawat at the close of all the evidence. As we have stated above, verdicts should be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In the instant case, plaintiff's only expert, Dr. Keltner, testified that the emergency room physician had failed to perform to the standard because he had abandoned the patient, having failed to see that the patient was properly attended by having turned the care of him over to "a surgeon who was miles away, involved in another operation." He stated that the emergency room physician should have called another surgeon or had the patient transported by ambulance or helicopter to a hospital where he could have been treated. However, on re-cross by counsel for Dr. Inawat, Dr. Keltner stated that if the emergency room physician had not known that the surgeon would not be coming to treat the patient within a reasonable time, the emergency room physician would not have abandoned the patient. Dr. Inawat's understanding of the time of Dr. Ghosh's anticipated arrival at Centreville was, as we have said, greatly disputed. Dr. Inawat testified that he had written in his records that he had strongly recommended to Dr. Ghosh when he spoke with him while Charles

Landers was in the emergency room that the patient needed to be seen "at this moment" and that Dr. Ghosh had replied that he was "tied up" at St. Elizabeth's Hospital. Dr. Inawat stated that he had had no idea how long Dr. Ghosh was to be "tied up" but that he had anticipated that Dr. Ghosh would see the patient in approximately half an hour. He had, he said, informed Dr. Ghosh that the patient was not in distress and had been stabilized. He testified that Dr. Ghosh had not told him that he was starting an operation and that he had not known what Dr. Ghosh was doing at St. Elizabeth's Hospital. Earl Crawford, the nurse who assisted in the treatment of Charles Landers in the emergency room, testified that he had known Dr. Ghosh was "tied up" but that he had had no knowledge that Dr. Ghosh was starting surgery at St. Elizabeth's Hospital or what the extent of that surgery was. Dr. Ghosh, on the other hand, testified that he had told Dr. Inawat or the emergency room nurse that he was going into surgery in Granite City. He stated that Dr. Inawat had not told him the patient needed to be seen "at this moment" and that had Dr. Inawat done so he would have told Dr. Inawat that he could not come. Dr. Ghosh testified further that he had not told Dr. Inawat or anyone at Centreville that he would not arrive until 2:45 p.m., that he had given no exact time, and that he had told Dr. Inawat he was "tied up" and would see the patient when he finished at St. Elizabeth's Hospital in Granite City. The intensive care unit nurse, Ella Ross, who had been on duty when Charles Landers arrived there, testified that she had not known that Dr. Ghosh was in surgery. She had, she said, not been told when Dr. Ghosh would arrive but had been told that he was "tied up" at St. Elizabeth's Hospital in Granite City and would be at Centreville as soon as he could. In view of such a serious conflict in the evidence on such a crucial point of fact, it was decidedly not error for the trial court to deny the plaintiff's motion at the close of all the evidence for a directed verdict against Dr. Inawat. The question of fact was properly presented to the jury for its determination. If the jury believed that delay in the surgical treatment of Charles Landers' wounds caused his death, at least in part, it resolved the factual dispute about Dr. Inawat's understanding of Dr. Ghosh's schedule in favor of Dr. Inawat. In view of the conflicting testimony, the verdict was not, contrary to the plaintiff's assertions, against the manifest weight of the evidence.

Affirmed.

WELCH and HARRISON, JJ., concur.