DEBORAH CONNER, Indiv. and as Adm'r of the Estate of Karla Conner, Deceased, Plaintiff-Appellant, v. DANILO OFRENEO, Defendant-Appellee.

First District (1st Division)   No. 1—91—2255

Opinion filed December 30, 1993.

Goldberg & Goldberg and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

Pretzel & Stouffer, Chartered, of Chicago (Timothy A. Weaver, Robert Marc Chemers, and Michael G. Bruton, of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Plaintiff Deborah Conner brought a medical malpractice action against defendants Children's Memorial Hospital and Dr. Danilo Ofreneo to recover damages for the death of her daughter, Karla Conner, which plaintiff alleged was caused by the negligence of defendants. Defendant Children's Memorial Hospital settled with plaintiff before a verdict was entered, and plaintiff proceeded to trial against Dr. Ofreneo. Following a jury trial, a general verdict was returned against plaintiff and in favor of defendant.

On appeal plaintiff argues that the trial court: (1) erred in admitting into evidence the testimony of an expert defense witness who provided testimony and opinions that were not produced during discovery; (2) erred in permitting defendant to cross-examine plaintiff's expert witness, Dr. Barkin, regarding the standard of care and treatment rendered at Children's Memorial Hospital; and (3) the jury's verdict was against the manifest weight of the evidence. For the following reasons, we affirm.

According to the record, on February 5, 1980, Deborah Conner (plaintiff) took her daughter, Karla Conner, to the Uptown Clinic in Chicago. Karla had experienced excessive thirst, slurred speech, weight loss, and excessive bladder movement. While at the clinic, Karla eventually was examined by defendant Dr. Ofreneo, a general surgeon and general practitioner. Plaintiff testified that Ofreneo spent about 15 to 20 minutes with Karla asking specific questions and that Karla was not responsive to his questions. Dr. Ofreneo had X rays taken of Karla and requested a blood sample. Plaintiff testified that Dr. Ofreneo advised her to call him back to obtain the results of the blood tests, but he failed to advise her when Karla should return for a check-up.

After leaving the clinic, plaintiff took Karla home, where she continued to experience frequent bladder movement, stomach and head pains, hoarseness of the voice and general weakness. Later that evening, plaintiff took Karla to Children's Memorial Hospital (Children's) in Chicago.

Karla was treated at Children's by Dr. Tomasi. He performed blood and urine tests on Karla to determine her glucose level. Karla's glucose level was 1,126, and Tomasi concluded that a normal range for a child Karla's age was less than 120, assuming the child had not eaten a large carbohydrate meal. Tomasi concluded that Karla should be admitted to the hospital. Karla's primary problem was dehydration, poor circulation of blood to her brain, severe metabolic acidosis, and complications of diabetic ketoacidosis. The staff at the hospital attempted to increase Karla's blood pressure and correct her hydration by starting an IV.

Tomasi testified that it took an hour to hydrate Karla to a point where she could make urine. He stated that with a newly diagnosed diabetic it takes two or three days to correct the ketoacidosis. Tomasi testified that in the treatment of Karla it was necessary for the persons involved to take a history to discover the problems she was experiencing. Tomasi testified that Karla's history showed that she had slept and drunk more water than usual on the day she came to the hospital. He also noted that, according to plaintiff, Karla had lost 15 pounds within a two-day period. Tomasi stated that the results of the blood tests revealed that Karla had a large amount of ketones in her urine. He tried to correct Karla's hydration and to correct the acidosis by giving her bicarbonate. He also tried to correct the diabetic problem by giving her insulin in high doses in hopes that it would stop the production of the ketoacids.

Tomasi stated that it was necessary to correct the problem slowly enough to allow Karla to equilibrate within her body, but to correct

the condition rapidly enough so that she did not die in the process, of being treated. Karla later suffered heart failure, a physician was called and Karla was moved to intensive care. She later died. Tomasi testified that Karla's death was due to cardiorespiratory arrest which caused brain damage. Tomasi stated that he believed had Karla not been critically ill when she arrived at the hospital, the volume of fluid she received would not have resulted in her death.

On cross-examination Tomasi testified that the hospital records indicated that Karla was lethargic and had slurred speech when she arrived at the hospital. He stated that in comparison to what is described in the authoritative texts for treatment of a patient in diabetic ketoacidosis, Karla received excessive fluids. He agreed that excessive fluids can lead to pulmonary edema, to hypoxia, to cardiac arrest and ultimately to death.

Dr. Barkin testified as an expert on behalf of plaintiff. He stated that, in his opinion, Dr. Ofreneo deviated from the standard of care when he failed to perform and/or record an adequate medical history of Karla and failed to recognize the significance of her illness. He also opined that Ofreneo failed to perform adequate and timely laboratory tests and failed to intervene in a timely fashion. Barkin testified that each of these deviations caused or contributed to Karla's death. He further testified that the amount of fluid Karla received at the hospital contributed to Karla's death and that he did not believe the excess fluid was the sole cause of her death.

On cross-examination Dr. Barkin agreed that the fluid overload led to pulmonary edema, which led to hypoxia, causing cardiac pulmonary edema and, ultimately, Karla's death.

Dr. Kessel testified on behalf of defendant. He stated that on February 5, 1980, he examined Karla for an acute illness which was relatively mild at that time. He testified that Karla was diabetic and mild to moderately dehydrated at 10 a.m. Based upon the variance in the physical findings between 10 a.m. and midnight, Karla rapidly progressed from mild to severe ketoacidosis.

Kessel testified that the standard of care did not require Dr. Ofreneo to consider the possibility of diabetes based upon the information available to him at 10 a.m. that morning. Kessel stated that Ofreneo's failure to diagnose diabetic ketoacidosis did not cause or contribute to Karla's death. In his opinion, defendant's examination was within the applicable standard of care. He testified that he believed the sole cause of death was the fluid overload which occurred while Karla was at the hospital.

Dr. Ofreneo testified on his own behalf that when Karla came to the clinic on September 5, 1980, she was fragile and skinny. Plaintiff

came into the office with Karla and told him that Karla was having abdominal pain, had not been eating well, and had experienced weight loss. Dr. Ofreneo examined Karla's head, eyes, nose, throat, heart, lungs and abdomen. He found nothing significant, although her throat was slightly red, indicating that it was congested. Ofreneo also stated that Karla's history was within normal limits, although he did testify that he did not write down her prior immunizations, illnesses or allergies. Her previous medical conditions and illnesses were not recorded.

Under the assessment portion of his report, Ofreneo indicated that Karla possibly suffered from anorexia. He ruled out appendicitis or other acute abdominal problems. He was concerned about the possibility of a chronic infection or a malignancy. Ofreneo did not suspect diabetic ketoacidosis because Karla did not have any signs or symptoms specifically indicating that condition when he examined her. Ofereno testified that at the end of the examination, he told Karla that he would call with the results of the tests as soon as he received them. He expected to receive the results two or three days after the test. He testified that he also instructed Karla to call him if anything happened before he called her back.

Prior to trial, plaintiff filed a motion *in limine* to bar defendant from asking questions of Dr. Kessel concerning causation issues and to bar Dr. Kessel from expressing any new or different opinions other than those expressed in his discovery deposition. Plaintiff sought to bar Dr. Kessel from rendering any opinion as to the care and treatment rendered by any doctor or nurse or other staff at Children's Memorial Hospital on the basis that in the course of his discovery deposition he had not held any opinions concerning the treatment rendered at Children's Memorial Hospital. The court heard argument on the motion and reviewed the portions of the deposition which were in question. The court ruled that Dr. Kessel could not add new opinions that had not been disclosed in discovery. The court eventually ruled that it would allow him to testify that too much fluid was the cause of Karla's death.

■ Plaintiff first argues that the trial court erred in permitting Dr. Ofreneo to present a theory of defense based on an inference that Children's Memorial Hospital had negligently treated Karla and caused her injury. Specifically, plaintiff contends that defense counsel violated the court's ruling on her motion *in limine* which restricted questions regarding the hospital's standard of care. Plaintiff asserts that by questioning Dr. Kessel as to an overdose of fluids Karla received at Children's Memorial Hospital, defense counsel violated the court's original ruling that he not go into questions of the stan-

dard of care related to Children's Memorial Hospital. Plaintiff further maintains that Dr. Kessel's testimony at trial directly contradicted his deposition testimony. During his deposition, Dr. Kessel stated that he was not an expert in fluid management and would not testify as to Children's Memorial Hospital's treatment of Karla. At trial, Dr. Kessel testified that he had calculated the exact amount of fluids the night before and believed that Karla's dehydration was corrected too rapidly.

Plaintiff cites to *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213, for the proposition that a defendant whose negligence is a proximate cause of a plaintiff's injury cannot avoid responsibility merely because a third party is liable for negligence contributing to the same injury, even though the injury would not have occurred but for the negligence of the third party.

Defendant contends that the issues raised by plaintiff in this appeal relate to the issue of whether defendant's failure to diagnose Karla's condition was a proximate cause of her death. Defendant contends that the jury returned a general verdict, that no special interrogatories were submitted, and that there was sufficient evidence presented through the testimony of Dr. Kessel for the jury to conclude that defendant had complied with the applicable standard of care. Defendant concedes that one who is liable for negligence cannot avoid liability merely because another is liable for negligence contributing to the same injury. Defendant asserts, however, that in this case, he did not offer the evidence to establish concurrent or aggravating negligence, but to show evidence that what occurred at the hospital was relevant to the issue of whether defendant's conduct proximately caused decedent's death. Defendant asserts that the determination of the relevancy of evidence is largely within the discretion of the trial court (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 464 N.E.2d 751) and that here the evidence of cause of death was relevant.

Before trial, the court granted plaintiff's motion *in limine* to restrict defendant from adding new opinions to those which had not been disclosed during discovery. The court also ruled that defendant could not go into questions of the hospital's deviation from the standard of care when it attempted to rehydrate Karla. However, the court did make a specific finding that defendant could testify to the cause of death and that Karla died from too much fluid.

While it is true that the testimony of Dr. Kessel as to the cause of Karla's death placed before the jury an inference that the hospital deviated from a standard of care, the court admonished the jury:

"If you decide that a defendant was negligent and that his

negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of injury. However, if you decide that the sole proximate cause of the injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."

This instruction properly cleared any confusion which may have resulted from defendant's reference to the cause of Karla's death. It is presumed that the jury followed the court's instruction. (*Brooke Inns, Inc. v. S. & R. HI-FI & TV* (1993), 249 Ill. App. 3d 1064.) More significantly, Dr. Kessel did not offer any testimony about the care Karla received at the hospital, nor the care that should have been given. His testimony as to the cause of death was based on facts contained in the autopsy report, which he reviewed. The trial court stated that it did not believe that Dr. Kessel needed knowledge in treating diabetics with ketoacids to know that the pulmonary edema was caused by too much fluid. The court stated "I think [Dr. Kessel's] expertise is sufficient to know that." It is clear from the record that Dr. Kessel's testimony as to cause of death was based on his review of the autopsy report and the facts contained therein. We cannot say that defense counsel violated the trial court's motion *in limine* based on that fact.

■ Plaintiff also argues that the trial court permitted defendant to ask questions of plaintiff's expert witness, Dr. Barkin, concerning opinions that Barkin held regarding the hospital's deviation from the standard of care. Plaintiff contends that this inquiry was irrelevant and also violated the trial court's motion *in limine*. She maintains that because defendant's expert was allowed to question Dr. Barkin regarding his opinion, it implied to the jury that the hospital was negligent in its treatment of Karla. Defendant maintains that plaintiff opened the door to this inquiry when on direct examination Barkin testified that Karla received excessive fluids during her care at the hospital and that those fluids contributed to her death.

During direct examination of Barkin, counsel for plaintiff elicited testimony on the issue of the excessive fluid, and Barkin gave a response. The following colloquy occurred:

" Q. [Attorney Goldberg:] Now, is it your opinion that the amount of fluid [Karla] received was a contributing cause to her death?

A. [Dr. Barkin:] It was a contributing one of a myriad, one of several factors that contributed to her death, the others being the ones we discussed.

Q. Do you have an opinion as to whether with the care rendered, the fluid management at Children's was the sole cause or not?

A. Yes.

Q. What is that opinion?

A. That it was not the sole cause it was a contributing cause in a child that was already severely ill with diabetic ketoacidosis, and could not tolerate any additional stress to those that she had had."

Thus, on cross-examination of Barkin, it was proper for defense counsel to question Barkin on that issue. It is established that a party may introduce evidence, ordinarily improper, where the opponent has opened up the issue and the party seeking to introduce the evidence would be prejudiced unless allowed to introduce it. (*Voga v. Nelson* (1983), 115 Ill. App. 3d 679, 450 N.E.2d 1346.) Here, plaintiff opened the door to elicitation of the testimony and cannot now complain that she was prejudiced by any cross-examination defense counsel raised regarding areas dealt with on direct. See, *e.g., Haist v. Wei Wu* (1992), 235 Ill. App. 3d 799, 601 N.E.2d 927.

■ Plaintiff further maintains that Dr. Kessel was not qualified as an expert to give testimony that Karla was administered too much fluid, thereby causing her death. Specifically, plaintiff asserts that defendant testified that he was not qualified to render an expert opinion on fluid management and diabetic ketoacidosis. Plaintiff cites to *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867, for the proposition that to render an expert opinion as to the proper standards of diagnosis, care and treatment, the party offering the expert must affirmatively establish the expert's qualifications and competence to testify. Additionally, an expert's admission that he is not qualified may lead to a finding that the witness, in fact, is not qualified. *Landers v. Ghosh* (1986), 143 Ill. App. 3d 94, 491 N.E.2d 950.

We, again, reiterate that the trial court found Dr. Kessel competent to read the autopsy report and render an opinion as to the cause of death based on that report. There was no requirement that Dr. Kessel render an expert opinion as to causation, nor did he attempt to do so. We find no evidence in the record that he testified as to what the accepted standard of care was for the hospital. In fact, it was plaintiff's expert, Dr. Tomasi, who testified that a nurse at the hospital disobeyed a doctor's order and gave Karla excessive fluids. No prejudicial error results when there was other admissible evidence on that issue in the record. See, *e.g., Bradfield v. Illinois Central Gulf R.R. Co.* (1985), 137 Ill. App. 3d 19, 484 N.E.2d 365.

■ Plaintiff next argues that the trial court erred in allowing Dr. Kessel to testify to opinions that were not previously disclosed and to refer to a document which Kessel had not seen at the time of his deposition. Plaintiff alleges that in response to its Rule 220 interrogato-

ries served on defendant, defendant identified Dr. Kessel as his expert and stated that Kessel had expertise in the areas of general practice/ family practice. The answers further revealed that Dr. Kessel would testify to the standard of care issues, and that defendant's care and treatment did not proximately cause Karla's death. Plaintiff maintains that the answers given by defendant in response to the interrogatories served upon him were inconsistent with the testimony which Dr. Kessel provided in his deposition. In his deposition, Dr. Kessel stated that he was not an expert in the area of fluid administration, but he did state that based upon the pathologist's report he concluded that the cause of Karla's death was pulmonary edema.

At trial he testified that Karla had been given too much fluid at the hospital and this was the cause of the pulmonary edema. Supreme Court Rule 220 (134 Ill. 2d R. 220) prohibits an expert from having new or different opinions at the time of trial that are different than those held at the time of discovery. At trial, Kessel testified that the sole cause of Karla's death was the fact she received more fluids than her body could manage. This testimony was not provided during plaintiff's deposition of Kessel. Defendant contends that plaintiff's counsel never asked the question of whether excessive fluid was the "sole" cause of Karla's death.

While it is error for a Rule 220 witness to express an opinion at trial that was not disclosed during discovery, the error here was harmless. The court found that Dr. Kessel's trial testimony was close to testimony regarding the standard of care and struck that testimony. The court admonished the jury on the following day that the last answer had been stricken and was to be disregarded. Thus, any error that may have occurred where his trial testimony bordered on testimony as to the standard of care was cured when the trial court admonished the jury that the answer had been stricken. Where the jury is instructed by the court to disregard improper testimony, the jury is presumed to have followed the law. (*Storm v. Brown* (1973), 15 Ill. App. 3d 29, 303 N.E.2d 42.) Additionally, we find that Dr. Kessel's trial testimony was not inconsistent with the answers defendant provided in its interrogatories. The record reveals that both his deposition testimony as it related to the cause of death and his trial testimony were based on the information contained in the autopsy report.

■ Plaintiff also argues that the trial court erred by allowing into evidence a photostatic copy of the test results which had been received by defendant and from which Dr. Kessel changed his testimony relating to the dehydration test. During deposition, Kessel

testified that he believed the dehydration test result was 28, which reflected mild to moderate hydration. Before he testified at trial, defense counsel showed Kessel a clearer copy of the report. After reviewing this copy Dr. Kessel testified that the value for the test appeared to be 20, without expressing an opinion as to the degree of dehydration that number indicated. After lengthy discussion, the court determined that both copies could be published to the jury to allow it to decide whether anyone could determine the value associated with that test. Plaintiff argues that the admission of both tests was a violation of a stipulation between counsel that the only copies of the record which would be used were those which had been utilized during the discovery process.

Here, the court allowed both reports to be published to the jury for it to determine the value associated with that test. In a jury trial, it is the responsibility of the jury to determine the facts, weigh the evidence, and determine the credibility of the witnesses. Plaintiff's counsel questioned Dr. Kessel about the two copies of the report, and defendant had the opportunity to cross-examine Dr. Kessel as to the test results. Dr. Kessel testified that the test result of 28 reflected mild to moderate dehydration. After being shown a clearer copy which appeared to be a test result of 20, he did not change his opinion as to the degree of dehydration that number reflected. The admission of the two reports does not materially alter the evidence of record or even the medical evidence of record. Accordingly, given that the additional report was cumulative, any error which might have occurred was harmless. See, *e.g., Archer Daniels Midland Co. v. Industrial Comm'n* (1988), 174 Ill. App. 3d 918, 926, 529 N.E.2d 237.

■ Plaintiff finally argues that the jury's verdict was against the manifest weight of the evidence. Plaintiff maintains that the record supports the conclusion that defendant failed to perform or record an adequate history and to recognize the severity and significance of decedent's illness; that defendant's failure to diagnose diabetic ketoacidosis resulted in progression of Karla's disease to a critical point; and that defendant deviated from the standard of care due Karla.

In deciding whether to direct a verdict or to enter judgment *n.o.v.*, it is incumbent upon the trial court to apply the standard enunciated by our supreme court in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. There the court held that judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. In

this case, the jury determined that the acts by defendant were not the cause of Karla's death. In reviewing the evidence in the light most favorable to the opponent, we determine that verdict is supported by the evidence in the record, and we will not substitute our judgment for that of the jury. The evidence does not overwhelmingly favor plaintiff such that a contrary verdict could never stand. Therefore, the jury's determination was not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.