ROWENA REGALA *et al.*, as Next Friends of Ryan T. Regala, a Minor, *et al.*, Plaintiffs-Appellants, v. RUSH NORTH SHORE MEDICAL CENTER *et al.*, Defendants-Appellees (Bernard Michael Nagel *et al.*, Defendants).

First District (6th Division) No. 1—99—4049

Opinion filed March 30, 2001.—Rehearing denied July 31, 2001.—Modified opinion filed August 10, 2001.

James H. Canel & Associates, Ltd., of Chicago (James H. Canel and Richard F. Baylaender, of counsel), for appellants.

Bollinger Ruberry & Garvey, of Chicago (Barry G. Bollinger and Brent W. Vincent, of counsel), for appellees.

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiffs, Rowena and Roberto Regala, brought a medical mal-

practice action individually and on behalf of their infant son, Ryan Regala, against defendants, Rush North Shore Medical Center (the hospital), Arlene Boyle, R.N., Rose Monahan, R.N., Doctor Bernard Michael Nagel and Women's Health Consultants (WHC). A jury verdict was rendered in favor of all defendants. The circuit court denied plaintiffs' posttrial motion regarding Nurse Boyle, Nurse Monahan, and the hospital (hereinafter collectively referred to as defendants), but remanded for a new trial as to Doctor Nagel and WHC, based upon their untimely withdrawal of a disclosed expert witness. On appeal, plaintiffs argue that the court erred by: (1) denying their motion for a new trial against defendants; (2) refusing to give certain jury instructions; (3) allowing the hospital's expert to give previously undisclosed Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)) opinion testimony; (4) barring questions about a Christmas party attended by defendant Monahan; and (5) denying plaintiffs' motion for sanctions. We reverse and remand for a new trial.

Plaintiff received prenatal care from Doctor Nagel, a board-certified obstetrician and gynecologist. On December 19, 1990, six days after her expected due date, plaintiff experienced abdominal discomfort and saw bright red blood in her panty liner. Plaintiff called Doctor Nagel, who sent her to the hospital for a non-stress test (NST) to establish fetal well-being.

On December 19, plaintiff arrived at the hospital, where Nurse Boyle attached plaintiff to an external fetal monitor to do the NST. By 11 a.m., Nurse Boyle charted her NST impressions, which were normal and reassuring of fetal well-being.

Nurse Boyle took plaintiff's blood pressure, which was 142/102. Plaintiff's 142/102 blood pressure was elevated and abnormal and placed her at risk for preeclampsia and placental abruption. Doctor Nagel testified that he asked Nurse Boyle on December 19 whether plaintiff was doing okay and that Nurse Boyle responded "yes." Nurse Boyle testified that she would not have stated that plaintiff was doing okay unless she had retaken plaintiff's blood pressure and determined that it was normal. However, plaintiff's chart reflects only the 142/102 blood pressure.

Doctor Nagel performed a vaginal exam on plaintiff on December 19; no apparent, active bleeding was found during the exam. Doctor Nagel discharged plaintiff and instructed her to "follow-up" on December 20.

At noon on December 20, Doctor Nagel examined plaintiff in his office. During the exam, plaintiff's blood pressure was 164/98. This was the first time in plaintiff's pregnancy that Doctor Nagel was aware of a significantly elevated blood pressure. Nagel also found a trace of

protein in plaintiff's urine. Plaintiff's elevated blood pressure and the protein in her urine indicated that plaintiff was at risk for preeclampsia.

At 12:20 p.m. on December 20, Doctor Nagel admitted plaintiff to the hospital's labor and delivery unit, where she came under the care of nurse Monahan. Nurse Monahan testified that she did not have time to look at plaintiff's prenatal chart prior to her arrival at the hospital.

Nurse Monahan took plaintiff's blood pressure, which was now 163/97. Nurse Monahan performed a urine test, which showed an abnormal amount of protein, another indicator of preeclampsia. Nurse Monahan applied the fetal monitor to plaintiff and determined that the fetus lacked good heart accelerations, perhaps because it was sleeping. To wake the fetus, Nurse Monahan gave plaintiff a bolus containing a large quantity of fluid and instructed her to stay on her left side.

Doctor Nagel arrived at the hospital about 1 p.m. and examined plaintiff. After learning that plaintiff's blood pressure had remained elevated and that she had a significant amount of protein in her urine, Doctor Nagel ruptured plaintiff's bag of waters and attached a fetal scalp electrode to the fetus's head to monitor its heart rate.

After rupturing the bag of waters and inserting the fetal scalp electrode, Doctor Nagel returned to his office. Nurse Monahan stayed with plaintiff for approximately 10 to 15 minutes after Doctor Nagel left, then she exited plaintiff's room and went to a room behind the nurse's station.

A few minutes later, plaintiff looked at the fetal monitor and noticed that the fetal heart rate had dropped. Plaintiff pushed the nurse's call button, but there was no response. Plaintiff then told her husband, Roberto, to go find a nurse.

Roberto went down the hall to the nurse's station, but nobody was there. He then saw a room filled with people, food, and decorations. Someone in the room approached Roberto and asked him if he needed help. Roberto stated that he needed to find his wife's nurse because he was concerned about the numbers on the fetal monitor. Nurse Monahan then walked over to Roberto, and they went back to plaintiff's room.

When Nurse Monahan entered the room, she looked at the monitor and saw that the fetus's heart rate had dropped suddenly at about 1:20 p.m. Nurse Monahan knew that the fetus was in distress and she began intrauterine resuscitation. She also summoned Doctor Nguyenphuc, an obstetrician on the labor and delivery unit, who determined that plaintiff was experiencing a placental abruption.

Someone on the labor and delivery unit contacted Doctor Nagel, who immediately returned to the hospital and performed an emergency cesarean (C-section) on plaintiff. The baby (Ryan) was delivered at 1:43 p.m., about 22 minutes after the drop in the fetal heart rate. Ryan was born brain damaged.

After the delivery, Doctor Nagel found a 25% placental abruption and evidence of preeclampsia. According to the hospital's expert, Doctor Vannucci, Ryan's brain damage began at 1:36 p.m. Doctor Vannucci testified, to a reasonable degree of medical certainty, that Ryan would be normal today had he been delivered by 1:33 p.m.

Plaintiffs claimed that Doctor Nagel was negligent for: (1) failing to admit plaintiff for further assessment and monitoring on December 19; (2) failing to perform a C-section on December 20 shortly after admitting plaintiff to the hospital; (3) failing to attempt intrauterine resuscitation on December 20; (4) rupturing plaintiff's bag of waters on December 20; and (5) leaving plaintiff after rupturing her bag of waters on December 20.

Plaintiffs claimed that Nurse Boyle was negligent for (1) failing to advise Doctor Nagel that plaintiff had an elevated blood pressure of 142/102 on December 19; and, (2) telling Doctor Nagel that plaintiff was "okay," knowing that plaintiff had an elevated blood pressure of 142/102.

Plaintiffs claimed that Nurse Monahan was negligent for: (1) failing to review plaintiff's prenatal records on December 19; (2) failing to advise Doctor Nagel about the presence of a nonreassuring fetal monitor strip on December 20; (3) failing to perform intrauterine resuscitation on plaintiff on December 20 when the fetus failed to respond to the bolus of fluid; (4) failing to call Doctor Nagel and tell him about the protein in plaintiff's urine and the fetus' failure to respond to the bolus of fluid; (5) failing to ask Doctor Nagel to remain with plaintiff after rupturing her bag of waters; (6) leaving plaintiff after Doctor Nagel ruptured the bag of waters; and (7) failing to respond in a timely manner to the call button used by plaintiff.

The jury returned a verdict in favor of all defendants. The circuit court subsequently remanded for a new trial against Doctor Nagel and WHC due to their improper withdrawal of an expert witness. Plaintiffs filed this timely appeal.

●1 Plaintiffs argue that the trial court abused its discretion by allowing defense expert Doctor John Elliott to testify with new opinions not previously disclosed pursuant to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). Defendants argue that plaintiffs waived this issue by failing to raise it in their posttrial motion. *Mazurek v. Crossley Construction Co.*, 220 Ill. App. 3d 416, 422 (1991). Our review of the

record indicates that within 30 days of the entry of judgment, the circuit court granted plaintiffs an extension of time to raise allegations of error in their posttrial motion. Plaintiffs raised the Rule 213 issue within the time extension allowed by the court. Accordingly, plaintiffs adequately preserved the issue for review.

●2 Rule 213(g) states:

"An opinion witness is a person who will offer any opinion testimony. Upon written interrogatory, the party must state:

(i) the subject matter on which the opinion witness is expected to testify;

(ii) the conclusions and opinions of the opinion witness and the bases therefor; and

(iii) the qualifications of the opinion witness;

and provide all reports of the opinion witness." 177 Ill. 2d R. 213(g).

The committee comments to Rule 213 state that, "in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule *** and that no new or additional opinions will be allowed unless the interests of justice require otherwise." 177 Ill. 2d R. 213(g), Committee Comments. Thus, Rule 213 is mandatory and strict compliance is required. *Seef v. Ingalls Memorial Hospital,* 311 Ill. App. 3d 7, 21 (1999).

●3 Here, in their response to plaintiffs' Rule 213 interrogatories, defendants disclosed Doctor Elliott's opinion that Ryan suffered all of his neurological damage as a result of a "sudden catastrophic event" (the placental abruption) that occurred at about 1:22 p.m. on December 20. Doctor Elliott's opinion was consistent with plaintiffs' theory that Ryan would have been born undamaged if he had been delivered prior to the placental abruption on December 20.

At trial, though, Doctor Elliott testified on redirect examination that "the exact same sequence of events" (*i.e.,* the placental abruption leading to Ryan's neurological damage) would have occurred even if Doctor Nagel had delivered Ryan on December 19. Doctor Elliott's testimony contradicted plaintiffs' theory that defendants caused Ryan's injuries by delaying Ryan's delivery until the afternoon of December 20. Doctor Elliott's testimony was a new opinion not previously disclosed pursuant to Supreme Court Rule 213(g).

Defendants argue that plaintiffs opened the door during cross-examination of Doctor Elliott for the testimony elicited on redirect examination. We disagree. On cross-examination, plaintiff asked:

"Q. Doctor, would you agree that if the baby had been delivered within four to six hours of the strip, the NST on the 19th, that the baby would have been delivered neurologically intact based on that strip?

A. If the C-section had been done, yes, I would agree with that."

Doctor Elliott's testimony on cross-examination was consistent with his disclosed Rule 213 opinion that Ryan's neurological damage was caused by the placental abruption on December 20. By contrast, on redirect examination Doctor Elliott went beyond the scope of cross-examination by testifying to new opinions not previously disclosed under Rule 213, specifically, that Ryan's neurological damage would have occurred even if Doctor Nagel had delivered him on December 19. As discussed, those new opinions were inadmissible. The effect of the erroneous admission of Doctor Elliott's undisclosed opinions mandates reversal and remand to the trial court for a new trial. See *Seef*, 311 Ill. App. 3d at 24 ("We strongly urge practitioners that, if an opinion is important to the theory of one's case, it is essential that it and the bases therefor be disclosed. This is a bright line rule and must be followed").

As the proponent of the witness, defendant bore the obligation to ensure that Doctor Elliott not exceed previously disclosed opinions. The penalty for the introduction of such inadmissible testimony is exacted from the proponent of the witness, regardless of whether the testimony comes out on direct, cross, or redirect examination. Experts must be made aware by their attorney of the importance that their opinions at trial are consistent with their pretrial disclosures.

Defendants cite case law interpreting former Rule 220. Such case law is irrelevant here. Effective January 1, 1996, Rule 213 (166 Ill. 2d R. 213, now 177 Ill. 2d R. 213) replaced Supreme Court Rule 220 (134 Ill. 2d R. 220) in setting forth the disclosure requirements for opinion witnesses. As discussed, the appellate court has interpreted Rule 213 as providing a mandatory, "bright line rule" which must be followed by practitioners (see *Seef*, 311 Ill. App. 3d at 24); further, our supreme court has not recognized any exceptions to Rule 213. Thus, cases interpreting former Rule 220 and the various exceptions thereto are not persuasive.

•4 Next, plaintiffs argue that the court erred in giving the following instruction based on Illinois Pattern Jury Instructions, Civil, No. 105.01 (3d ed. 1990) (hereinafter IPI Civil 3d):

"In providing professional services to [plaintiff], an obstetrical nurse must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified obstetrical nurse under the circumstances similar to those shown by the evidence. A failure to do so is professional negligence.

The only way in which you may decide whether an obstetrical nurse possessed and applied the knowledge and used the skill and care which the law required of her is from expert testimony pre-

sented at trial. You must not attempt to determine this question from any personal knowledge you have."

Plaintiffs argue that IPI Civil 3d No. 105.01 improperly compels the jury to ignore all admitted evidence except for expert testimony. We disagree. IPI Civil 3d No. 105.01 does not instruct the jury that it can only consider expert testimony in reaching a verdict; rather, IPI Civil 3d No. 105.01 instructs the jury that it must utilize the expert medical testimony to determine the standard of care and any deviation therefrom. IPI Civil 3d No. 105.01 properly states the law. See, e.g., *Jones v. Chicago HMO Ltd.*, 191 Ill. 2d 278 (2000); *Advincula v. United Blood Services*, 176 Ill. 2d 1 (1996) (in professional negligence cases, plaintiff bears the burden of establishing the standard of care through expert witness testimony.)

Plaintiffs argue that the court should have given the parenthetical in IPI Civil 3d No. 105.01, which states that the jury may also consider "evidence of professional standards or conduct" in determining the standard of care and any deviation therefrom. Plaintiffs cite cases holding that the standard of care required of a hospital in an institutional negligence case may be shown by evidence of professional standards and conduct. The cases cited by plaintiffs are inapposite, as plaintiffs' allegations are not premised on institutional negligence, but rather on the alleged negligence of the hospital's two employee nurses. See *Advincula*, 176 Ill. 2d at 31 (the tort of institutional negligence does not encompass a hospital's responsibility for the conduct of its medical professionals).

Plaintiffs also cite *Kramer v. Milner*, 265 Ill. App. 3d 875 (1994), which held that the circuit court abused its discretion in refusing to give the parenthetical "evidence of professional standards or conduct" where the expert witnesses extensively relied on professional standards in deducing a standard of care. Our review of the record here reveals that plaintiffs' expert Charlotte Daniels similarly relied on professional standards in deducing a standard of care. Accordingly, the court erred in refusing to give the parenthetical.

For the foregoing reasons, we reverse and remand for a new trial. As a result of our disposition of this case, we need not address plaintiffs' other arguments for reversal.

Reversed and remanded.

CAMPBELL, P.J., and GALLAGHER, J., concur.