YVETTE BRYANT *et al.*, Indiv. and as Parents and Next Friends of Kylie Bryant, a Minor, Plaintiffs-Appellants, v. LaGRANGE MEMORIAL HOSPITAL, Defendant-Appellee (Yong Kim *et al.*, Defendants).

First District (3rd Division)   No. 1—02—0518

Opinion filed December 17, 2003.

566

Bruce R. Pfaff and Michael T. Gill, both of Bruce R. Pfaff & Associates, of Chicago (Michael W. Rathsack, of counsel), for appellants.

David C. Hall, of Hall, Prangle & Schoonveld, L.L.C., and Hugh C. Griffin and Stevie A. Starnes, both of Lord, Bissell & Brook, both of Chicago, for appellee.

JUSTICE HALL delivered the opinion of the court:

This case concerns an action for medical malpractice brought by plaintiffs Yvette Bryant and Amos Bryant, individually and as parents and next friends of the minor plaintiff, Kylie Bryant, against defendants Dr. Yong Kim, Dr. Shanta Nath, and the LaGrange Memorial Hospital (Hospital) for injuries Kylie Bryant suffered just prior to her delivery. The jury returned a verdict in plaintiffs' favor and against Dr. Kim, awarding damages in the amount of $30 million. However, the jury found in favor of the Hospital and Dr. Nath.

Plaintiffs accepted the $1 million insurance policy limit of Dr. Kim and settled the matter with Dr. Nath's employer for $100,000. Thereafter, plaintiffs filed a posttrial motion, which the trial court subsequently denied. Plaintiffs now appeal from the verdict and judgment in favor of the Hospital.[1]

On appeal, plaintiffs contend that: (1) the trial court erred by refusing to give subparagraph D of plaintiffs' proposed issue instruction No. 13; (2) the trial court erred by refusing to give three modified versions of the pattern duty instruction; and (3) the trial court erred by allowing the Hospital's expert, Dr. MacGregor, to testify with opinions not previously disclosed pursuant to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). For the reasons that follow, we affirm.

## FACTUAL BACKGROUND

Yvette Bryant was admitted to the labor and delivery unit of the Hospital at approximately 2:30 a.m. on August 9, 1995. She was at full term and was two days past her estimated due date. Her vital signs were normal. Yvette Bryant planned a VBAC delivery[2], meaning she planned to attempt to deliver vaginally after having previously delivered by cesarean section (C-section)[3]. Complications arose however and Kylie Bryant was delivered by emergency C-section. Upon delivery, Kylie Bryant was limp and not breathing. She was im-

---

[1]The caption on plaintiffs' brief makes reference to Drs. Kim and Nath as defendants-appellees, but they are not involved in the instant appeal.

[2]"VABC" stands for "vaginal birth after cesarean section." Plaintiffs' expert witness, Dr. Bernard Gore, an obstetrician-gynecologist, testified that there are more risks associated with a VBAC delivery than with a regular vaginal birth. Dr. Gore testified that the single biggest risk is the possibility of the rupture of the uterus at the previous cesarean section scar site.

[3]Dr. Gore defined a cesarean section as an abdominal incision made into the uterus in order to extract the baby through the abdomen.

mediately resuscitated but was later diagnosed as suffering from cerebral palsy.[4]

Thereafter, plaintiffs Yvette Bryant and Amos Bryant, individually and as parents and next friends of the minor plaintiff, Kylie Bryant, filed a medical malpractice action against defendants Dr. Kim, Dr. Nath, and the Hospital, seeking to recover damages on the theory that Kylie Bryant suffered permanent brain damage due to a deprivation of oxygen just prior to her delivery. A jury trial commenced on July 26, 2001, where the following facts were established.

In late evening, on August 8, 1995, Yvette Bryant began to experience the early stages of labor. On August 9, 1995, at approximately 2:30 a.m., Yvette Bryant was admitted to the Hospital, where she was attended to by labor and delivery nurses Susan Tully, R.N., and Susan Horner, R.N. Yvette Bryant was at full term and was two days past her estimated due date. The nurses took Yvette Bryant's vital signs, which were normal, drew blood, attached an IV to keep Yvette Bryant hydrated and the baby active, attached an external electronic fetal monitor[5] to Yvette Bryant's abdomen, and then called her obstetrician, Dr. Kim. At 3 a.m., the fetal monitor indicated a heart rate of 140 beats per minute[6]. A vaginal examination indicated that Yvette Bryant's cervix was dilated 3 centimeters (10 centimeters dilation is required for vaginal delivery). Nurse Tully testified that at this time, Yvette Bryant's condition was normal and that she was having regular contractions.

Dr. Kim arrived at the Hospital at approximately 3:15 a.m. Dr. Kim artificially ruptured Yvette Bryant's bag of waters, or amniotic sac, and attached an internal scalp lead on the baby's head in order to more accurately monitor the baby's heart rate. Nurse Tully testified that when the bag of waters was ruptured she noted that there was a

---

[4]Dr. Gore defined cerebral palsy as motor impairment due to cerebral damage.

[5]An electronic fetal monitor is a machine that produces a printout or fetal monitoring strip to "continually assess the fetal heart rate and the relationship of the fetal heart rate to maternal contractions, and are continually analyzed to determine whether there is fetal distress or stress upon the fetus caused by a lack of oxygen to the fetus." *Baglio v. St. John's Queens Hospital*, 303 A.D.2d 341, 342, 755 N.Y.S.2d 427, 428 (2003). An external fetal monitor is essentially an ultrasound transmitter affixed to the woman's abdomen that monitors the baby's heart rate.

[6]At trial, it was established that the normal baseline heart rate of a baby while in the womb going through labor is 120 to 160 beats per minute.

large quantity of thick meconium[7] in the amniotic fluid. Dr. Kim then ordered that Yvette Bryant undergo an amnioinfusion, which is a procedure whereby a catheter is placed up around the uterus and a saline solution is run through the catheter in order to irrigate or rinse out the meconium. Yvette Bryant was administered two bags of saline solution during this procedure.

Nurse Tully testified that Dr. Shanta Nath, a neonatologist, was then called to the Hospital since hospital policy required that a neonatologist be called whenever meconium is observed. At 3:30 a.m., the fetal heart rate was 145. Dr. Nath testified that she arrived at the hospital at approximately 3:40 a.m. Dr. Nath testified that she did not provide any care to Yvette Bryant in her laboring state or provide any advice to Dr. Kim or the labor and delivery nurses. Dr. Nath testified that her primary role was to provide care to Yvette Bryant's baby once the baby was delivered.

At 4 a.m. the fetal heart rate was 135. A vaginal exam conducted at about 4:15 a.m. indicated that Yvette Bryant was dilated to 4 centimeters. Nurse Tully testified that at about 4:30 a.m. she administered Yvette Bryant a pain reliever called Nubain through an IV line.

At 4:30 a.m. the electronic fetal heart monitor strip evidenced a bradycardia or abnormally low heart rate in the 60s for $4^{1}/_{2}$ minutes. In response to the low fetal heart rate, the nurses performed various standard interventions including increasing Yvette Bryant's IV fluids, physically turning Yvette Bryant on her side, and administering oxygen through a face mask. After the interventions were performed, the fetal heart rate returned to the baseline for about a minute.

At about 4:35 a.m., the fetal heart rate decelerated or dropped to the 90s for about $1^{1}/_{2}$ minutes. In response to this drop, the nurses repositioned Yvette Bryant and tipped the head of her bed down, and Dr. Kim manually stimulated the baby's scalp. The baby's heart rate returned to baseline for about $2^{1}/_{2}$ minutes.

At approximately 4:40 a.m., the fetal monitor strip indicated that the baby's heart rate had decelerated into the 60s. For the succeeding 17 minutes the external monitor failed to give a continuous paper tracing.[8] Nurse Horner testified that during the time the external

---

[7]Dr. Gore testified that meconium is a sort of fetal fecal material that collects in the fetal intestinal tract *in utero*. The doctor testified that the presence of meconium in the amniotic fluid puts medical personnel on notice that there could be potential problems with the fetus.

[8]Only one of the monitors (either internal or external) can be plugged

monitor was not tracing properly she "auscultated"[9] the audible signals being emitted from the external monitor in order to determine the baby's heart rate. Nurse Horner testified that shortly after 4:40 a.m., the baby's fetal heart rate dropped to the 60s with no sustained return to baseline for approximately 17 minutes. Dr. Kim became concerned that the monitor was not tracing properly and therefore changed the internal lead on the baby's scalp and the "toco,"[10] in order to get a better paper tracing.

Due to a continued lack of uninterrupted tracings, Dr. Kim ultimately decided to change monitor machines. The monitor was switched at approximately 4:53 a.m. While the monitor was being switched Nurse Horner stimulated the baby's scalp. Nurse Horner testified that after Dr. Kim made the decision to change monitors she consulted Nurse Linda Stauber, because she was unfamiliar with a monitor being changed in response to concerns over equipment tracings. Nurse Stauber was a senior labor and delivery nurse who was charge nurse and was Horner's supervisor. Nurse Stauber came into the delivery room shortly before 4:57 a.m.

Nurse Stauber took a radial pulse of Yvette Bryant's wrist and compared her pulse to the audible fetal heart rate on the monitor and determined that the baby's heart rate was much slower than Yvette Bryant's heart rate. A little after 4:57 a.m., the newly connected fetal monitor showed that the baby's heart rate had fallen to the 50s for about 3½ minutes. In addition, Nurse Horner noted continuous late decelerations with each contraction. Due to the continuous low fetal heart rate tracings on the new fetal monitoring machine, Dr. Kim ordered an emergency C-section at approximately 5 a.m. At about 5:23 a.m., Dr. Kim made the first incision for Yvette Bryant's C-section delivery. Kylie Bryant was born at 5:28 a.m.

Plaintiffs called two expert witnesses to testify against Dr. Kim and the Hospital nurses. Dr. Bernard Gore, a practicing obstetrician-gynecologist, testified regarding the national obstetrical standard of care applicable to Dr. Kim and the national nursing standard of care

---

into the fetal monitoring machine at one time. The record indicates that from 4:35 a.m. to 4:57 a.m., only the external monitor was being used and that the internal monitor was not used again until approximately 4:57 a.m.

[9]"Auscultation" is "[l]istening to the sounds made by the various body structures as a diagnostic method." Stedman's Medical Dictionary 169 (26th ed. 1995).

[10]The internal lead goes from the mother's vagina to the toco and from the toco to the monitoring machine. The toco is a wire that sits on the mother's abdomen and picks up the fetus's heart tones, by transmitting information from the internal lead to the monitor machine.

applicable to labor and delivery nurses Tully and Horner. Nurse Sharon Hall testified regarding the standard of care applicable to the labor and delivery nursing staff.

Dr. Gore opined that Dr. Kim breached the appropriate standard of care by failing to order that Yvette Bryant undergo an emergency C-section at 4:40 a.m., when the baby's heart rate had decelerated to the 60s with no sustained return to baseline for approximately 17 minutes. Dr. Gore opined that at 4:40 a.m., once the fetal monitor strip indicated such a drastic drop in the fetal heart rate, the applicable standard of care did not allow for Dr. Kim to change the fetal monitoring equipment instead of ordering an emergency C-section. Dr. Gore stated that if Dr. Kim was concerned that the fetal monitoring equipment was not recording properly, he could have used alternative methods to determine the fetal heart rate as opposed to taking the time to change the monitoring equipment. Dr. Gore opined that in order for Dr. Kim to have complied with the applicable standard of care, the baby would have had to have been born between 4:50 a.m. and 5 a.m., rather than 5:28 a.m.

In regard to the conduct of the Hospital's nursing staff, Dr. Gore opined that Nurses Tully and Horner breached the applicable standard of care when the baby's heart rate decelerated to the 60s with no sustained return to baseline for approximately 17 minutes and the nurses responded by following Dr. Kim's orders to change the fetal heart monitoring equipment rather than immediately notifying Nurse Stauber of the decelerations. Dr. Gore testified that in light of the fact that Yvette Bryant was a VBAC patient and the biggest concern with such patients is a ruptured uterus, often evidenced by decelerations in the fetal heart rate, the applicable standard of care required the nurses to notify Nurse Stauber of the decelerations at an earlier time than they actually did.

Nurse Sharon Hall, the plaintiffs' expert on nursing care, opined that at 4:40 a.m., when the baby's heart rate decelerated to the 60s with no sustained return to baseline for approximately 17 minutes, the applicable standard of care required the nurses to inform Dr. Kim that the resuscitative interventions had been unsuccessful and that, therefore, an order for an emergency C-section should be considered. Nurse Hall went on to testify that if Dr. Kim did not respond immediately to the nurses' concerns, then the nurses should go over the doctor's head and initiate the "chain of command," and notify the supervising nurse of the seriousness of the situation. Nurse Hall opined that the nurses were negligent by failing to notify Nurse Stauber of the situation 5 or 10 minutes sooner than they actually did.

The Hospital's nursing care expert, Dr. Scott MacGregor, disagreed

with the plaintiffs' experts. Dr. MacGregor opined that the nurses met the applicable standard of care. The doctor testified that the nurses acted appropriately in response to the decelerations in the baby's heart rate occurring at 4:30 a.m. and 4:35 a.m., when they applied standard interventions such as giving Yvette Bryant IV fluids, physically turning her on her side, and administering oxygen through a face mask.

In regard to the time period of 4:40 a.m. to 4:53 a.m., Dr. MacGregor testified that the nurses had no clear definitive evidence that the baby was in trouble because the fetal monitor was not tracing properly. Dr. MacGregor stated that during this time period, the nurses had no reason to conclude that there was anything inappropriate in Dr. Kim's decision to change the leads to the internal fetal monitor once the fetal monitoring machine stopped giving continuous paper tracings. Dr. MacGregor testified that his review of the records, depositions, and fetal monitoring strips indicated that there was nothing that obligated the nurses to invoke the chain of command and go over Dr. Kim's head.

Kathleen Simpson, R.N., Ph.D., the Hospital's expert on nursing care, testified that the applicable standard of care did not require the nurses to invoke the chain of command in order to bring about a C-section sooner than Dr. Kim ordered. Nurse Simpson testified that nothing in the records or in the data from 4:40 a.m. to 4:53 a.m. obligated the nurses to invoke the chain of command. Nurse Simpson stated that during this time period Dr. Kim was at Yvette Bryant's bedside and had all of the same information the nurses had during that period.

Dr. Kim testified that at 4:40 a.m., when there was incomplete tracing, he did not have enough information to determine whether the baby was in danger or that a C-section was required. Dr. Kim testified that very shortly after 4:53 a.m., a new tracing showed that the baby was in serious trouble. Dr. Kim testified that he ordered the C-section at approximately 5 a.m. However, Dr. Kim also acknowledged that at his deposition he stated that he ordered a C-section at approximately 4:30 a.m. Dr. Kim also conceded that at his deposition he stated that he was prevented from performing the emergency C-section at 4:45 a.m. because he lacked an anesthesia assistant. Notwithstanding his deposition statements, Dr. Kim testified that once he made the decision to do a C-section, the arrangements were carried out in a timely fashion. Dr. Kim did not recall having to wait for any medical personnel before he performed the C-section.

On August 8, 2001, the jury returned a verdict in favor of plaintiffs and against Dr. Kim in the amount of $30 million. The jury also

returned verdicts in favor of the Hospital and Dr. Nath. Dr. Nath was subsequently dismissed from the case. Plaintiffs settled their right to pursue Dr. Kim by accepting payment of his $1 million insurance policy, and settled claims against Dr. Nath by accepting $100,000 from her employer. Plaintiffs filed a posttrial motion only against the Hospital. On January 14, 2002, the motion was denied and this appeal followed.

## ANALYSIS

### I. Subparagraph D of Issue Instruction No. 13

Plaintiffs first contend that the trial court erred by refusing to give subparagraph D of their proposed issues instruction No. 13 (based on Illinois Pattern Jury Instructions, Civil, No. 20.01 (2000) (hereinafter IPI Civil (2000))). Subparagraph D of this jury instruction provided:

> "The plaintiff claims that she was injured and sustained damage, and that defendant LaGrange Memorial Hospital was negligent in one or more of the following respects: D) it failed to complete preparations for a cesarean section delivery in a timely manner."

The Hospital counters that the trial court properly refused to give subparagraph D of the instruction because plaintiffs failed to present any expert testimony or other evidence to support the allegations in this subparagraph. We agree with the Hospital.

■ Each party is entitled to have the jury clearly and fairly instructed upon each theory that is supported by the evidence. *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 405, 603 N.E.2d 1203 (1992). In order to justify giving an instruction, some evidence in the record must support the theory set out in the instruction. *Khatib v. McDonald*, 87 Ill. App. 3d 1087, 1095, 410 N.E.2d 266 (1980). It is within the trial court's discretion to determine what issues are raised by the evidence and whether an instruction should be given. *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1070, 657 N.E.2d 657 (1995). The test for determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions in their entirety. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100, 658 N.E.2d 450 (1995).

In this case, the plaintiffs did not present any evidence supporting the allegation in subparagraph D of the instruction that the Hospital "failed to complete preparations for a cesarean section delivery in a timely manner." Specifically, there was no expert testimony or other evidence presented showing that the nurses violated the applicable standard of care in completing preparations for the C-section or that

any institutional conduct on the part of the Hospital delayed commencement of the C-section.

Here, whether Dr. Kim ordered the C-section at 4:30 a.m., as he initially testified at his deposition, or between 4:50 a.m. and 5 a.m., as he testified at trial, there was never any evidence presented that the C-section medical team was untimely assembled. At trial, Dr. Kim testified that he ordered the C-section between 4:50 a.m. and 5 a.m., and the presented evidence revealed that the incision which began the C-section was made at 5:23 a.m.

Plaintiffs argue that Dr. Kim's deposition testimony regarding the time periods he ordered the C-section and began the incision, along with the anesthesiologist's testimony that from his home he could typically get to the Hospital in 10 minutes, all lead to the implication that the nurses did not call the anesthesiologist in a timely manner. There is no evidence to support the plaintiffs' argument.

For example, uncontroverted evidence was presented that the nurses called an anesthesiologist as soon as Dr. Kim ordered the C-section and that this complied with the applicable standard of care. Uncontroverted evidence was also presented that the nurses prepared Yvette Bryant for surgery within five minutes of the time the C-section was ordered.[11]

The evidence showed that the first anesthesiologist the nurses contacted was unavailable and that a call was then made to the backup anesthesiologist, Dr. Oswaldo Lastres, who lived near the Hospital and could typically be at the Hospital within 10 minutes of receiving a call. Dr. Lastres testified that even though he typically could get to the Hospital in 10 minutes, he had no recollection of the precise amount of time it took him to arrive at the Hospital in the present case. Dr. Lastres further testified that once he arrived at the Hospital he would have to prepare Yvette Bryant for general anesthesia.

In the present case, not one witness, expert or otherwise, offered any opinion testimony criticizing the nurses or the Hospital for anything it did after Dr. Kim ordered the C-section, regardless of the timing of that order. Moreover, no evidence was presented attributing any alleged delay in completing preparations for the C-section to a breach of the standard of care by the nurses or the Hospital.

■ Where it is alleged that a hospital should be held responsible

---

[11]Evidence was presented that pursuant to the standard set forth by the American College of Obstetricians and Gynecologists (ACOG), the incision to begin an emergency C-section should be made within half an hour after the procedure is ordered. The Hospital had adopted this standard.

for the conduct of its agent or employee medical professionals under vicarious liability, as in this case, a hospital's conduct is measured against a professional standard of care. See *Advincula v. United Blood Services*, 176 Ill. 2d 1, 31, 678 N.E.2d 1009 (1996). In the instant case, the only claims submitted to the jury against the Hospital were claims of negligent nursing care. These were claims of professional negligence. Consequently, this is not an "institutional negligence" case. See *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253 (1965) (holding that hospitals may be held liable for institutional negligence); *Advincula*, 176 Ill. 2d at 31 (stating that "[t]he area of liability recognized by *Darling* does not encompass, whatsoever, a hospital's responsibility for the conduct of its agent or employee medical professionals").

■ In a professional negligence case, the standard of care required of a defendant medical professional is to act as would an "ordinarily careful professional." *Advincula*, 176 Ill. 2d at 23. Under this standard of care, a professional is expected to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise in similar circumstances. *Advincula*, 176 Ill. 2d at 23-24.

■ In a medical negligence case against a hospital based on vicarious liability for the conduct of its nurses, it is necessary for a plaintiff to present expert testimony to establish the standard of care and that its breach was the proximate cause of plaintiff's injury. *Snelson v. Kamm*, 204 Ill. 2d 1, 42, 787 N.E.2d 796 (2003). The rationale for requiring expert testimony is that a lay juror is not skilled in the practice of medicine and is, therefore, unequipped to evaluate professional medical conduct without the aid of expert testimony. *Advincula*, 176 Ill. 2d at 24.

An exception to the general rule requiring expert testimony is recognized in medical malpractice actions where the medical professional's conduct is so grossly negligent or the treatment so common that a layperson may understand the conduct without the need for an expert to establish the standard of care and its breach. *Walski v. Tiesenga*, 72 Ill. 2d 249, 256, 381 N.E.2d 279 (1978); *Prairie v. University of Chicago Hospitals*, 298 Ill. App. 3d 316, 321, 698 N.E.2d 611 (1998). For example, expert testimony is not required to meet the burden of proof in medical malpractice cases involving obvious careless acts from which a lay person could use his common knowledge and infer negligence, such as leaving a sponge or an instrument in a patient's body after surgery. See *Comte v. O'Neil*, 125 Ill. App. 2d 450, 454, 261 N.E.2d 21 (1970). The common knowledge exception permits jurors to utilize their own experiences in determining whether a medical act or omission was negligent. *Metz v. Fair-*

*bury Hospital*, 118 Ill. App. 3d 1093, 1098, 455 N.E.2d 1096 (1983). The common knowledge exception, however, is rarely applied and is strictly limited to its facts. *Weekly v. Solomon*, 156 Ill. App. 3d 1011, 1017, 510 N.E.2d 152 (1987).

At oral argument, plaintiffs' counsel argued that the common knowledge exception applied, since no expert medical testimony was required for the jury to determine that the nurses assembled the surgical team for the C-section in an untimely manner. Plaintiffs' counsel argued that jurors could use their common knowledge and infer that after Dr. Kim ordered the C-section, the nurses did not timely call the anesthesiologist, in light of Dr. Kim's deposition testimony regarding the time periods he ordered the C-section and began the incision, and the anesthesiologist's testimony that from his home he could typically get to the Hospital within 10 minutes of receiving a call. Plaintiffs' reliance on the common knowledge exception is misplaced.

■ Again, whether Dr. Kim ordered the C-section at 4:30 a.m., as he testified at his deposition, or at 5 a.m., as he testified at trial, the fact remains that no witness, expert or otherwise, offered any testimony criticizing the nurses or the Hospital for anything that was done after Dr. Kim ordered the C-section, regardless of the timing of that order. In the instant case, the issue of whether the nurses completed their preparations for the C-section within the standard of care pertained to matters involving medical judgment. Therefore, expert testimony was required to establish the standard of care, its breach, and the element of proximate cause. Here, there was no expert opinion testimony supporting any allegation that the nurses violated the applicable standard of care in completing their preparations for the C-section. Neither was there expert opinion testimony that the conduct of the nurses in completing preparations for the C-section proximately caused the baby's injuries. We hold that the trial court did not abuse its discretion in refusing to give subparagraph D of issue instruction No. 13.

## II. IPI Civil (2000) No. 105.01

■ Plaintiffs next contend that the trial court erred in refusing to give three modified versions of the pattern duty instruction, IPI Civil (2000) No. 105.01. Plaintiffs maintain that the modified instructions told the jury to consider "opinion and policies" as evidence of the Hospital's negligence. Plaintiffs argue that the instruction the trial court actually gave the jury, IPI Civil (2000) No. 105.01, limited the jury's consideration to only evidence received by way of "expert" testimony. We must reject plaintiffs' contentions.

IPI Civil (2000) No. 105.01 "does not instruct the jury that it can only consider expert testimony in reaching a verdict." *Regala v. Rush North Shore Medical Center*, 323 Ill. App. 3d 579, 586, 752 N.E.2d 443 (2001). Rather, that instruction, which was given here, expressly tells jurors that they can consider expert testimony or "evidence of professional standards or conduct presented at trial," in determining the standard of care and any deviation therefrom. Therefore, plaintiffs' argument that the jury might not recognize that it could consider the testimony of Dr. Kim and the nurses is meritless.

In addition, since this case concerned professional negligence and not institutional negligence, the standard of care required of the Hospital could not be shown by evidence of hospital policies and procedures. See *Advincula*, 176 Ill. 2d at 29 (stating that the standard of care required of a hospital in a case of institutional negligence may be shown by a wide variety of evidence including hospital bylaws, accreditation standards, custom and community practice).

### III. Rule 213

■ Plaintiffs finally contend that the trial court abused its discretion by allowing the Hospital's expert, Dr. MacGregor, to testify with opinions not previously disclosed pursuant to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). Specifically, plaintiffs maintain that Dr. MacGregor gave not-previously-disclosed opinion testimony that the nurses could not have heard the fetal monitor give audible tones if the monitor was unable to pick up sufficient heart tones to make uninterrupted paper tracings.

Prior to Dr. MacGregor's testimony, Nurse Horner testified that during the time the external monitor was not tracing properly, she heard audible signals from the external monitor indicating that the baby's heart rate had decelerated to the 60s for approximately 17 minutes. Thereafter, during Hospital counsel's direct examination of Dr. MacGregor, counsel asked the doctor whether he believed there were any audible tones coming from the monitor machine between 4:40 a.m. and 4:53 a.m., the time the monitor was not tracing properly. Plaintiffs' counsel objected pursuant to Rule 213 and moved to strike the doctor's answer. Hospital counsel replied that he was not asking for the doctor's opinion but rather the doctor's understanding of the facts.

During a sidebar out of the hearing and presence of the jury, plaintiffs argued that Dr. MacGregor's answer was undisclosed opinion testimony. After hearing arguments on the matter, the trial court sustained plaintiffs' objection and struck Dr. MacGregor's answer on the ground that it represented a new opinion. Hospital counsel then

asked, "Will the court then not allow me to re-ask this witness what his understanding of the facts is as to whether there was an audible tone or not in that time period?" When the trial court asked if there was any objection, plaintiffs counsel asked, "What [is] the evidence from the materials he reviewed up to the time of his deposition?" Hospital counsel responded, "Sure, I mean just—." Plaintiffs counsel then responded, "That's fine."

When the sidebar ended and the proceedings continued, Hospital counsel asked Dr. MacGregor, "Do you just have an understanding whether or not the fetal heart tones were audible in the labor room during these periods of time where we don't see any recordation on the strips?" Dr. MacGregor answered, "I don't understand that there were. There's no recording that the heart rates were audible and that they couldn't be recorded. And that would be pretty uncommon that you could hear the heart rate but it wouldn't record on the monitor." After plaintiffs' counsel moved to strike the answer, the trial court struck the last sentence without further objection from plaintiffs' counsel.

The testimony of which plaintiffs now complain occurred during Hospital counsel's redirect examination of Dr. MacGregor where counsel asked, "Mr. Pfaff asked you some questions as to whether it's true you have no information as to whether the nurses could hear an audible signal during this time period. From, your understanding of how electronic fetal monitoring equipment works, do you believe that would be likely during those time periods where there's no physical tracing?" Again, plaintiffs' counsel objected pursuant to Rule 213. Hospital counsel responded that plaintiffs' counsel had opened the door to this inquiry on cross-examination.

On cross-examination, plaintiffs' counsel had asked Dr. MacGregor the following question, "Okay. Where is it in any of the testimony of the nurses where they say that between 4:40 and 4:53 they could not hear the audible on the monitor, could not see the visual or could not hear the alarms on the machine?" The trial court agreed that plaintiffs' counsel's cross-examination had opened the door to the doctor's testimony.

We find that the trial court's ruling on the matter was correct. Where a plaintiff opens the door to elicitation of certain testimony, the plaintiff cannot complain that he was prejudiced by any cross-examination defense counsel raised regarding that testimony. See *Conner v. Ofreneo*, 257 Ill. App. 3d 427, 434, 628 N.E.2d 1150 (1993).

## IV. Conclusion

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.