# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Rodriguez v. Northeast Illinois Regional Commuter R.R. Corp.*, 2012 IL App (1st) 102953

---

| | |
|---|---|
| Appellate Court Caption | LENORA RODRIGUEZ, Plaintiff-Appellant, v. NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a Metra/Metropolitan Rail, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-10-2953 |
| Filed | January 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a FELA action for the shoulder injury plaintiff suffered while working as a conductor, the appellate court rejected plaintiff's contention that she was entitled to a new trial on damages limited to the issue of disability because the jury's award of damages for lost wages and pain and suffering but nothing for disability was legally inconsistent and against the manifest weight of the evidence, since the hypothesis that compensating plaintiff for both lost wages and disability would result in a double recovery provided a reasonable basis for the verdict and refuted the argument that the verdict was irreconcilably inconsistent; furthermore, the verdict was not against the manifest weight of the evidence in view of the conflicting evidence as to the extent of plaintiff's injury, the job she sought to resume, and the amount of her future wage loss. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-1708; the Hon. James P. Flannery, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | George T. Brugess and Steven P. Garmisa, both of Hoey & Farina, of Chicago, for appellant. |
| | |
| | Thomas N. Osran, Jay S. Judge, and Michael E. Kujawa, all of Judge, James & Kujawa, LLC, of Park Ridge, for appellee. |
| | |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Cunningham concur in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff Lenora Rodriguez sued defendant Metra, her employer, under the Federal Employers' Liability Act (45 U.S.C. § 51 (2006)). A jury awarded her over $100,000 in damages for lost wages and pain and suffering, but awarded nothing for disability. On appeal, she contends that the jury's verdict is legally inconsistent and against the manifest weight of the evidence and seeks a new trial on damages limited to the issue of disability. Rodriguez also contends that the trial court erred in limiting the scope of the redirect examination of her medical expert notwithstanding the fact that the topic was addressed in cross-examination. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                 I. BACKGROUND

¶ 3     Rodriguez began working as an assistant conductor for Metra in 2005. Primarily, her job involved taking tickets on passenger trains. Her position also required her to "throw switches" at the train yard at the beginning and end of her shift, which means pulling and pushing the levers that change the direction of the railroad tracks. Throwing switches can require conductors to exert up to 100 pounds of force.

¶ 4     On August 27, 2006, Rodriguez was assigned to work as a switch tender, exclusively throwing switches to redirect trains as they approached a work zone. At the end of the work day, a switch got "hung up" and required Rodriguez to exert more force to push the lever down. She then heard something "pop" and felt pain radiating through her back and left shoulder. She reported the incident to her supervisor and saw Metra's doctor, Dr. Stephen Hartsock, the next day. After an initial examination and MRI, Rodriguez was diagnosed as having a "small, full-thickness tear" of her rotator cuff.

¶ 5     Rodriguez filed this lawsuit against defendant in February of 2007 under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 (2006)), alleging that Metra negligently failed to provide her with a safe workplace because it did not properly maintain the switch equipment that caused her injury. After trial, a jury found in favor of Rodriguez on liability.

The verdict form instructed the jury to indicate the total amount awarded to Rodriguez and to itemize the damages according to past and future disability, past and future pain and suffering, and past and future lost wages and benefits. The jury awarded Rodriguez a total of $107,000, itemized as $75,000 for pain and suffering and $32,000 for lost wages. It awarded nothing for disability.

¶ 6    Rodriguez's first argument on appeal is that she is entitled to a new trial on disability damages because the jury's verdict was legally inconsistent and against the manifest weight of the evidence. The following testimony relevant to the issue of disability damages was adduced at trial.

¶ 7    Rodriguez called Dr. Dennis Gates to testify as an expert in orthopedic surgery. Although Dr. Gates never examined Rodriguez, he reviewed all of the medical records prepared by each physician or surgeon Rodriguez saw and prepared a chart summarizing those records. Dr. Gates testified to the dates of each visit, a brief description of what occurred, and any relevant notes made by the doctors. He testified that at Rodriguez's first medical visit the day after her shoulder injury, Dr. Hartsock restricted her to sedentary work. About a week later, Dr. Hartsock told Rodriguez to stop working altogether and begin physical therapy.

¶ 8    About a month later, Rodriguez was referred to Dr. James Davis, an orthopedist. Dr. Davis noted that Rodriguez's range of motion had increased and he told Rodriguez that she could return to work as a conductor but limited the activities that she could perform.

¶ 9    Rodriguez also saw Dr. Hartsock again at this time. Dr. Gates testified that there was some "confusion" in Dr. Hartsock's notes for the visit. Dr. Hartsock indicated that he told Rodriguez to "continue light duty[, but] Dr. Davis hadn't really mentioned that." Nevertheless, Dr. Gates testified, Rodriguez was "on light duty, which means no lifting over 20 pounds and nothing overhead." Dr. Hartsock also ordered an MRI, which revealed that Rodriguez had a "small but full-thickness tear of the rotator cuff." Dr. Gates also testified that the tear shown on the MRI was consistent with Rodriguez's description of pushing the switch with an outstretched arm.

¶ 10   Dr. Hartsock then referred Rodriguez to Dr. Brian Cole, an orthopedic surgeon, for a consultation. Dr. Cole ultimately concluded that Rodriguez would need surgery to repair the rotator cuff tear and he performed the surgery in December of 2006. On May 21, 2007, about five months after the surgery, Dr. Cole released Rodriguez to return to work as a conductor without restrictions. She continued physical therapy and took pain medication at that time.

¶ 11   Dr. Gates testified that Rodriguez returned to Dr. Cole in July of 2007 complaining of pain in her left shoulder. Dr. Cole told her that she would continue to experience some discomfort for a while. Rodriguez continued to work, although she called in sick on days that she felt great pain. On January 14 or 15, 2008, after Rodriguez threw a switch, her left shoulder got stiff and she could not move it. Rodriguez saw Dr. Hartsock the next day. He again restricted Rodriguez to light-duty work, lifting no more than 10 pounds.

¶ 12   Dr. Gates testified that Rodriguez got a second opinion from another orthopedic surgeon, Dr. David Smith, about a month later. Dr. Smith ordered another MRI. Dr. Gates testified that a radiologist concluded that Rodriguez had a possible partial-thickness tear of the rotator cuff. Dr. Smith noted inflammation around the tendon.

¶ 13 Rodriguez returned to Dr. Cole in April of 2008 and provided him with Dr. Smith's MRI. Dr. Cole directed Rodriguez to undergo a functional capacity examination (FCE), which compares Rodriguez's physical abilities to the requirements of her job as a conductor. Ridge Rehab conducted Rodriguez's FCE in May of 2008. Among other things, Rodriguez's job required her to lift and carry 10 to 20 pounds occasionally, push and pull up to 100 pounds, and reach overhead occasionally. Rodriguez could lift and carry 10 to 20 pounds, but her "deficit was in pushing and pulling 100 pounds." The FCE concluded that Rodriguez could perform light-duty work, but could not return to work as a conductor.

¶ 14 Dr. Gates then testified that Rodriguez returned to Dr. Smith about a week after performing the FCE. She continued to complain of constant pain in her shoulder. According to Dr. Gates, Dr. Smith reviewed the FCE and concluded that Rodriguez "was at MMI," meaning she had reached her maximum medical improvement and her shoulder would not get any better. Dr. Smith concluded that Rodriguez could not return to work as a conductor. He also stated that Dr. Cole could be of no further assistance to her.

¶ 15 Dr. Gates then testified that in his opinion, Rodriguez had a torn rotator cuff repaired by surgery and she possibly tore her rotator cuff again after surgery. Dr. Gates also testified that in his opinion, "[i]t seemed reasonable" that Rodriguez's injuries were caused by the accident that occurred in August of 2006 when she was throwing switches. Dr. Gates opined that Rodriguez's prognosis was "guarded[,] which simply means that things aren't going the best. We don't really know what's going to happen. I thought that most likely she's going to need an arthroscopic evaluation to look inside the shoulder again with a telescope and to clean out whatever is there but we really don't know." He also opined that she would need physical therapy in the future and, more likely than not, occasional cortisone injections.

¶ 16 Dr. Gates then testified that in his opinion, Rodriguez has a disability as a result of her injury, surgery, and treatment. He defined disability as "the inability to perform certain actions usually in regard to [one's] work status." He stated that in his opinion, Rodriguez's disability is that she can perform "the light level of work which means that she could not return to her duties as a conductor."

¶ 17 On cross-examination, Dr. Gates acknowledged that he had a copy of the conductor's job description prepared by Metra at the time that he issued his expert report. He acknowledged that the job description says that a conductor must be able to exert 30 to 100 pounds of occasional push force to throw a switch. The job description also stated that "overall this job would be classified as light in physical demand according to the Department of Labor Dictionary of Occupational Titles." Dr. Gates also acknowledged that in January of 2008, Dr. Hartsock twice described Rodriguez's complaints of pain as "out of proportion" with her physical examination and "inconsistent."

¶ 18 Dr. Gates was then shown a report issued to another one of Rodriguez's doctors by Accelerated Rehabilitation Center stating that as of July 16, 2009, Rodriguez was experiencing no pain in her left shoulder and she was successfully discharged from

rehabilitation.[1] Rodriguez's counsel sent a copy of that report to Metra along with a letter requesting that Metra consider returning Rodriguez to her position as a conductor. Dr. Gates was asked whether the information contained in the report would change any of his opinions. Dr. Gates testified that "reading this whole letter over here and not just the paragraph you mentioned [about experiencing no pain in her shoulder] but the whole thing[,] it seems that she has really been rehabilitated so, yes, I'd have to change my opinion." However, on redirect examination, Dr. Gates testified that the July 16, 2009, report did not state that Rodriguez had "reached the functional capacity of being able to push 30 to 100 pounds occasionally, the push force to throw a switch."

¶ 19    Rodriguez then called Terry Cordray to testify as an expert in vocational rehabilitation. Cordray conducted an interview with Rodriguez and reviewed her medical records. He compared Rodriguez's physical capabilities to the demands of the job of conductor. As a conductor, Rodriguez must be able to push and pull up to 100 pounds in order to throw a switch. Cordray testified that according to the Department of Labor guidelines, that level of work is classified as heavy duty. Cordray further opined that Metra's job description classifying the job as light duty was wrong.

¶ 20    Cordray noted that Dr. Smith released Rodriguez to work at a light-duty level in May of 2008. He also noted that Dr. Smith determined that Rodriguez had reached maximum medical improvement and, therefore, she could never return to work as a conductor. Cordray opined that Rodriguez's shoulder injury was the only reason that she could not work as a conductor.

¶ 21    Cordray stated that Rodriguez's shoulder injury is an impairment that prevents her from doing her job; thus, Rodriguez has a disability. As a consequence of her disability, Rodriguez was restricted in the number of jobs she could apply for. Cordray analyzed Rodriguez's education and previous work experience and concluded that she was only capable of earning a maximum of $14 per hour. On cross-examination, he admitted that his opinions might change if he learned that in July of 2009, Rodriguez sought medical clearance to return to work as a conductor.

¶ 22    Cornelius Hoffman then testified as Rodriguez's economic expert. He testified that while employed at Metra, Rodriguez earned about $41,000 in net wages. Relying on Cordray's analysis, which concluded that Rodriguez was limited to earning about $30,000 per year, Hoffman concluded that Rodriguez would lose approximately $11,000 per year in future earnings. He then determined that Rodriguez's future lost earnings and her lost benefits over the 18.5 years Rodriguez is expected to remain in the work force would result in future lost earnings and benefits of $456,000 to $500,000.

¶ 23    On cross-examination, Hoffman acknowledged that his analysis relied on Cordray's assessment of Rodriguez's ability to make money. He also acknowledged that if Dr. Gates had testified that Rodriguez appeared to have rehabilitated herself and could return to work

---

[1]Dr. Gates was also cross-examined with an additional FCE performed on Rodriguez on June 3, 2009. The relevant contents of that FCE and the corresponding cross-examination will be discussed in greater detail below.

as a conductor, she would experience no wage loss.

¶ 24    Rodriguez also testified about her disability. She confirmed that she was placed on restricted work duty while she was injured. She also testified that after her surgery, she was immobilized in a sling for four to five weeks. Both before and after surgery, Rodriguez testified that she was unable to go shopping, wash her hair, or participate in recreational activities.

¶ 25    Metra tendered the evidence deposition of Dr. Cole in its case. Dr. Cole stated that after rotator cuff surgery like Rodriguez's, a patient "could expect to have residual discomfort with some activities. *** Possibly forever." When asked if residual discomfort would "permanently keep her from physically being able to do the things that she did before surgery," Dr. Cole said, "I don't know. It depends. Everyone's different. *** Many patients have some residual deficits after rotator cuff repair." Nevertheless, he had no record of Rodriguez complaining that she could not engage in any activities that she participated in before her surgery.

¶ 26    When Rodriguez returned to Dr. Cole in May of 2007, he stated that Rodriguez showed good progress after her December 2006 surgery and her physical therapy was going well. Although Rodriguez complained of symptoms at that time, he prescribed an anti-inflammatory medication and released her to return to work. He found that Rodriguez's "[m]otion was not normal but highly functional and strength was good and pain was minimal." He believed that Rodriguez had "healed sufficiently" to return to work as a conductor for Metra without any physical restrictions or limitations.

¶ 27    When Rodriguez returned to see Dr. Cole in March of 2008, she presented him with the MRI performed by Dr. Smith. Dr. Cole stated that the MRI showed that Rodriguez's rotator cuff appeared to be intact and did not retear, despite her complaints of debilitating pain. During Dr. Cole's physical examination, Rodriguez appeared somewhat weak and complained of pain with overhead positioning. He treated her with a cortisone shot.

¶ 28    Rodriguez saw Dr. Cole again in April of 2008. She "continued to have pain that [Dr. Cole] couldn't really substantiate and project an etiology or cause of." Therefore, he ordered her to undergo an FCE to "gain an objective description of what her limitations should be." Dr. Cole stated that in the meantime, Rodriguez could return to work "with limited use of the upper [left] extremity to include no overhead lifting activities, no lifting, pushing or pulling greater than 15 pounds and no repetitive machinery." Nevertheless, Dr. Cole described her prognosis as "good to excellent" at this time.

¶ 29    Dr. Cole testified that Rodriguez had another FCE done on June 3, 2009. He testified that the "outcome was that Rodriguez had the ability to function at a light physical demand level according to the U.S. Department of Labor standards for 8 hours a day. However, her performance was inconsistent when she was evaluated during a battery of consistency tests *** [which] implies that she might or could be able to do more than what the test demonstrated because of self-limiting behavior."

¶ 30    When Dr. Cole was asked whether Rodriguez had achieved "normalcy compared to where she was before her injury," he replied, "I would say she had not reached normalcy. However, I have no–I don't know how to objectively tell you what her impairment was."

When asked whether Rodriguez had any "impairment that would have kept her from returning to the job that she previously held," he said "I don't know."

¶ 31    Metra called Kathleen Raven to testify. She is the occupational therapist who conducted the June 3, 2009, FCE with Rodriguez. She stated that the FCE is a physical examination lasting about seven hours. She first has patients perform objective tests to evaluate their strength, walking, standing, squatting, and posture. She then has patients perform activities that simulate their jobs based on the job description to see what they are capable of doing. She then compares the patient's performance to the job's requirements. Raven testified that in this case, Metra's job description for the assistant conductor position was classified as light-duty labor by the United States Department of Labor, whose standards she typically relies on in these tests.

¶ 32    Raven testified that there are built-in cross-references among the tests she administers and she knows how a person should respond if there is weakness, or pain, or a lack of full effort. Raven concluded that the June 3, 2009, FCE was technically "invalid" because Rodriguez's inconsistent results indicated that she was not putting forth full effort during the examination. In such cases, the documented levels of function are considered minimum levels of function. Raven specifically noted that although Rodriguez reported having a great deal of pain in her left shoulder, she observed Rodriguez steering her car with her left hand while holding a cell phone in her right hand when leaving the parking lot of the testing facility.

¶ 33    Raven's report documented that Rodriguez demonstrated "a higher level of functioning than required to perform the lifting requirements of her job as a conductor." However, her report also showed that Rodriguez exhibited a deficit in her ability to push a lever with more than 43 pounds of force and pull a lever with more than 52 pounds of force. Ultimately, Raven's report concluded that Rodriguez's job "required a [l]ight work level for return to work" and she demonstrated the ability to function in the light physical demand level category according to the Department of Labor standards.

¶ 34    On cross-examination, Raven acknowledged that the job description for conductors requires that they are able to push between 30 and 100 pounds. She admitted that the United States Department of Labor standards defines "heavy" physical demand as exerting 50 to 100 pounds of force occasionally. She also confirmed that the most "push/pull" force Rodriguez could exert was 52 pounds and that Rodriguez would need assistance to exert 100 pounds of force.

¶ 35    On redirect examination, Raven explained that the Department of Labor standards are based on lifting capabilities, not pushing and pulling capabilities. Therefore, she testified that "all the functional capacity evaluations *** go by the actual lift capabilities when comparing it to the Department of Labor." Accordingly, she reiterated that the conductor job was a light-duty job based on the lifting requirements.

¶ 36    Metra also called its vocational expert, Julie Bose, to testify. She reviewed Rodriguez's FCE results, her employment records and work history for the past 15 years, and her past wage rates and benefits. Bose also reviewed Metra's job description for a conductor. She testified that both Metra and the Department of Labor classify a conductor as a light-duty job.

-7-

¶ 37    Bose then compared Rodriguez's FCEs, completed on May 9, 2008, and June 3, 2009, to Metra's job description. She stated that although the May 2008 FCE concluded that Rodriguez could not return to work as a conductor, it also concluded that she was capable of performing light-duty work. She explained that Rodriguez's injury was to her nondominant hand and accommodations could be made for that injury. She also recounted that at Rodriguez's deposition, Rodriguez testified that she could push 100 pounds of force and pull 90 pounds of force. She also testified that the June 3, 2009, FCE concluded that Rodriguez could return to light-duty work. Therefore, Bose concluded, because the FCEs demonstrated that Rodriguez could perform light-duty work, she was able to return to work as a conductor, which in her opinion was classified as such.

¶ 38    Bose also testified that even if Rodriguez did not return to work as a conductor, her background and experience permitted her to work in marketing, substitute teaching, sales, and benefits management, all positions that have the potential to pay as much or more than a conductor. She opined that Cordray's conclusion that Rodriguez was limited to earning $14 per hour underestimated Rodriguez's vocational capabilities. Accordingly, Bose opined that Rodriguez would not experience any future loss of earnings.

¶ 39    Metra's economic expert, Gary Skoog, then testified. Based on Bose's expert report, he concluded that Rodriguez only realized $31,131 in lost wages incurred from the date of her injury until the date she was released to return to work on May 21, 2007. He also believed that because of her education and work experience, Rodriguez would not have any continual long-term wage loss. When asked what effect a disability has on a person's ability to produce income, Skoog testified that the object is to determine the best jobs that can be performed with a disability. He said that some people do very well with disabilities and others do less well depending upon their backgrounds, education, and work experience.

¶ 40    The jury instructions are not included in the record on appeal. However, the court gave the jury the following instructions on damages, which comport with Illinois Pattern Jury Instructions, Civil, Nos. 30.01, 30.04.01, 30.05, and 30.07 (2011) (hereinafter, IPI Civil (2011)).

   "If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate her for any of the following elements of damages provided by the evidence to have resulted from the negligence, taking into consideration the nature, extent, and duration of the injury[:]

   The disability experienced and reasonably certain to be experienced in the future; the pain and suffering experienced and reasonably certain to be experienced in the future as a result of injuries; the value of earnings and benefits lost and the present cash value of the earning and benefits reasonably certain to be lost in the future."

¶ 41    The jury was not given any instructions on the meaning of disability. The jury also was not instructed to consider damages for loss of a normal life experienced, past or future, as provided by IPI Civil (2011) Nos. 30.04.01 and 30.04.02.

¶ 42    The jury returned a verdict in favor of Rodriguez and awarded her $75,000 for past and future pain and suffering and $32,000 for "the value of earnings and benefits lost and the present cash value of earnings and benefits reasonably certain to be lost in the future."

However, the jury awarded her nothing for disability.

¶ 43     Rodriguez then filed a posttrial motion. Although she did not include her posttrial motion in the record on appeal, based on Metra's response and her reply, it appears that she sought a new trial on damages because the verdict was legally inconsistent and against the manifest weight of the evidence. She also appears to have argued that the trial court erred in limiting the scope of her redirect examination of Dr. Gates, which will be discussed in detail in section II.B. below.

¶ 44                               II. ANALYSIS
¶ 45                          A. New Trial on Damages
¶ 46     Rodriguez's first argument on appeal is that she is entitled to a new trial on damages because the jury's verdict is "legally inconsistent and against the manifest weight of the evidence." First, she contends that "the verdict of nothing for disability should be reversed as being *** legally inconsistent with the verdict on liability, economic loss, and pain-and-suffering" and cites *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453 (2008), in support of that claim. She also claims that there was "overwhelming and compelling evidence of continuing disability," making the jury's verdict against the manifest weight of the evidence.

¶ 47     There is some misapprehension about the proper standard of review and the appropriate legal framework to apply to these issues, among the parties as well as in recent cases published by this court. However, despite the lingering confusion, the supreme court has recently clarified these very matters.

¶ 48     Whether two verdicts are legally inconsistent is a question of law. *Redmond v. Socha*, 216 Ill. 2d 622, 642 (2005). Consequently, a trial court's order granting or denying a new trial based on a claim of legally inconsistent verdicts is subject to *de novo* review. *Redmond*, 216 Ill. 2d at 642.[2] However, whether a new trial is justified on the grounds that the verdict was against the manifest weight of the evidence is reviewed for an abuse of discretion. *Redmond*, 216 Ill. 2d at 651. That is, if the trial court, in the exercise of its discretion, finds that the verdict is against the manifest weight of the evidence, then it should grant a new trial. *Redmond*, 216 Ill. 2d at 651. However, where there is sufficient evidence to support the jury's verdict, it is an abuse of discretion for the trial court to grant a motion for a new trial. *Redmond*, 216 Ill. 2d at 651.

¶ 49     Rodriguez cites the correct standards of review, but conflates the legal analyses of the

_____

[2]We recognize that this court recently held that we review internally inconsistent verdicts for an abuse of discretion. *Poliszczuk v. Winkler*, 387 Ill. App. 3d 474, 489 (2008). However, that case misstates the holding in *Redmond*. *Redmond* held that whether two verdicts are legally inconsistent is a question of law. *Redmond*, 216 Ill. 2d at 642. It further subdivided legally inconsistent verdict cases into two types: internally inconsistent verdicts and multiple conflicting verdicts. *Redmond*, 216 Ill. 2d at 643. *Redmond* involved the latter type of inconsistency, but the court did not intend to assign different standards of review to each type. Rather, it held that the legal analysis in both types of cases was otherwise the same. *Redmond*, 216 Ill. 2d at 643. Therefore, we decline to follow *Poliszczuk* for that proposition of law.

issues. On the other hand, Metra only responds to Rodriguez's argument that the jury verdict is against the manifest weight of the evidence and ignores her claim that the verdict is legally inconsistent. Notwithstanding Rodriguez's failure to precisely articulate her arguments under the proper legal framework or include her posttrial motion in the record on appeal, we will nevertheless address her claim.

¶ 50    The gist of Rodriguez's claim is that the verdict is inconsistent because the jury found that Metra was negligent and awarded damages for some, but not all, of the injuries claimed. Rodriguez's claim is that the verdict is internally inconsistent or "inherently self-contradictory." (Internal quotation marks omitted.) *Redmond*, 216 Ill. 2d at 643 (distinguishing between cases involving single, internally inconsistent verdicts and those involving multiple verdicts inconsistent with each other).

¶ 51    Where, as here, the verdict is alleged to be internally inconsistent, we will exercise all reasonable presumptions in favor of the verdict, which will not be found legally inconsistent unless it is absolutely irreconcilable. *Redmond*, 216 Ill. 2d at 643. A verdict is not considered irreconcilably inconsistent if it is supported by any reasonable hypothesis. *Redmond*, 216 Ill. 2d at 644.

¶ 52    In this case, there is a reasonable hypothesis to support the jury's verdict awarding Rodriguez damages for pain and suffering and lost wages, but nothing for disability: namely, that compensating her for both lost wages and disability would be a double recovery. Rodriguez's theory of the case was that her shoulder injury was a disability and, consequently, she did not work as a conductor from August of 2006 to May of 2007. Although the jury instructions did not provide the jury with any guidance as to how to define disability, Rodriguez's experts did. Dr. Gates defined a disability as "the inability to perform certain actions usually in regard to [one's] work status." When asked whether Rodriguez had a disability, Cordray, the vocational expert, stated that her shoulder injury was an impairment that prevented her from doing her job and would therefore be classified as a disability. Rodriguez tendered the jury verdict form seeking damages for both lost wages and disability that was ultimately given to the jury. The jury apparently compensated Rodriguez for her inability to work for nine months by awarding her damages for lost wages rather than disability.

¶ 53    Rodriguez also contended that she had a "possible retear" of her rotator cuff after returning to work in May of 2007 and that she became permanently disabled and unable to return to work as a conductor. The jury apparently rejected her contention that Metra was responsible for any future lost wages or disability beyond the date that she returned to work in May of 2007, as Metra's experts, Bose and Skoog, testified. In fact, Skoog testified that Rodriguez was entitled to $31,131 in lost wages and the jury awarded her $32,000. Thus, there is a reasonable hypothesis to support the jury's verdict. Accordingly, the verdict was not legally inconsistent such that Rodriguez is entitled to a new trial on damages. See *Redmond*, 216 Ill. 2d at 644.

¶ 54    Rodriguez's reliance on *Dixon* is inappropriate on this issue. The court in *Dixon* was not asked to decide whether a verdict was legally inconsistent. Rather, that court analyzed whether a verdict was against the manifest weight of the evidence, which involves a different

standard of review and a different legal analysis. *Dixon*, 383 Ill. App. 3d at 469. Nevertheless, as discussed below, Rodriguez's alternative contention that the verdict was against the manifest weight of the evidence in this case is also unavailing.

¶ 55      A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on the evidence. *Redmond*, 216 Ill. 2d at 651. Specifically, in the context of a damages award, we will not upset a jury's verdict unless: (1) the jury ignored a proven element of damages; (2) the verdict resulted from passion or prejudice; or (3) the award bore no reasonable relationship to the loss. *Snelson v. Kamm*, 204 Ill. 2d 1, 37 (2003). The determination of damages is a question of fact for the jury to determine and its award is entitled to substantial deference. *Snelson*, 204 Ill. 2d at 36-37.

¶ 56      Rodriguez argues that the jury ignored a proven element of damages. She maintains that the evidence of her continuing disability was "overwhelming and compelling." She points to Dr. Gates' and Cordray's testimony that Rodriguez had reached maximum medical improvement and would be restricted to performing light or sedentary work for her remaining work life. She also points to testimony from Metra's witnesses who confirmed that Rodriguez was restricted to performing light-duty work. Rodriguez contends that this evidence establishes that she experienced at least some disability that should have been compensated.

¶ 57      However, while there apparently was no dispute that Rodriguez was restricted to light-duty work, there was conflicting evidence presented on the effect of that restriction on her ability to work as a conductor. There was also conflicting evidence presented on Rodriguez's future earning potential based on her work history and education. These disputes are central to her claim that she is entitled to compensation for a disability that rendered her permanently unable to work as or earn as much as a conductor.

¶ 58      Dr. Gates testified that given Rodriguez's disability, she could engage in the "light level of work[,] which means she could not return to her duties as a conductor." Cordray testified that a conductor must be able to push and pull up to 100 pounds of force in order to throw a switch, which is classified by the Department of Labor as heavy-duty work. Therefore, Cordray concluded that because Rodriguez was limited to light-duty work, she could not work as a conductor. Cordray testified that although Metra's job description stated that the job was light duty, that classification was incorrect. Additionally, Cordray concluded that Rodriguez was limited to earning $14 per hour, or approximately $30,000 per year, because her injury limited the number of jobs she could physically perform and her education and work experience would not warrant more. Based on that assessment, Hoffman testified that Rodriguez would be earning $11,000 per year less than her net salary as a conductor; thus, she would suffer future wage loss.

¶ 59      Conversely, Raven testified that the job of a conductor was considered light duty by the Department of Labor. She admitted that the Department of Labor standards define heavy-duty work as requiring exertion of 50 to 100 pounds of force occasionally, but explained that the standard referred to lifting capabilities, not pushing and pulling capabilities. She admitted that Rodriguez could only push and pull up to 52 pounds, but her performance fell within the

30- to 100-pound range required by Metra and she could push up to 100 pounds with assistance. Therefore, she concluded that Rodriguez was capable of performing light-duty work, which included the conductor position. Additionally, Bose testified that Rodriguez could earn at least $41,000 per year whether she returned to work as a conductor or sought alternative work as a college graduate with some management experience. Therefore, she and Skoog concluded that Rodriguez would experience no wage loss.

¶ 60    This conflicting testimony demonstrates that Rodriguez's claims of being permanently disabled and unable to earn as much as a conductor were not proven elements of damages. Rather, they were disputed issues subsequently resolved by the jury against Rodriguez. See *Snover v. McGraw*, 172 Ill. 2d 438, 448 (1996) (holding that the jury is charged with weighing the credibility of witnesses and determining the weight to give to the evidence); see also *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 180 (2008) (holding that the jury is free to accept or reject the evidence presented). Accordingly, the jury's damages award was not against the manifest weight of the evidence and the trial court did not abuse its discretion in denying her motion for a new trial.

¶ 61    Furthermore, although *Dixon* addresses whether a verdict is against the manifest weight of the evidence, it is distinguishable on the facts. In *Dixon*, the defendant conceded in its closing argument that "there was no dispute" that the plaintiff was disabled and unable to return to work as a conductor, but the jury nevertheless failed to award disability damages. *Dixon*, 383 Ill. App. 3d at 471. Therefore, the court held that the jury improperly ignored an uncontested and proven element of damages. *Dixon*, 383 Ill. App. 3d at 472.

¶ 62    Here, Rodriguez argues that Metra made a similar concession in its closing argument that Rodriguez was at least disabled for the nine months between the date of her injury and the date she returned to work. However, the transcript reveals that Metra consistently denied liability for plaintiff's injury. During closing argument, Metra allowed that "perhaps" there was "some element of disability" during that time period, but it also maintained that there was no credible independent testimony as to the extent of Rodriguez's injuries. Metra did concede that Rodriguez sustained a little over $31,000 in lost wages while recovering from surgery and the jury awarded damages for that injury. Nevertheless, Metra did not unequivocally concede that Rodriguez was disabled while recovering from surgery, and certainly did not concede that she reinjured her shoulder or became permanently disabled after returning to work.

¶ 63                    B. Improper Limitation of Redirect Examination

¶ 64    Rodriguez also appeals from the trial court's limitation of her redirect examination of Dr. Gates. During the direct examination of Dr. Gates, Rodriguez attempted to introduce a supplemental summary of Rodriguez's medical history prepared by Dr. Gates, which would have included the June 3, 2009, FCE performed by Raven. Metra's counsel objected, arguing that the supplemental summary had not been tendered to it, and therefore, it was an undisclosed opinion in violation of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). The court sustained the objection.

¶ 65    During cross-examination, Metra's counsel presented the same June 3, 2009, FCE to Dr.

Gates and asked the following questions about it:

> "Q. So you understand that during the [June 3, 2009, FCE] it was found that [Rodriguez] had a higher level of functioning than required to perform the lifting requirements of her job as a conductor.
>
> A. Yes.
>
> Q. You also knew that during that [FCE] it was found that [Rodriguez] demonstrated the ability to work as a conductor, correct?
>
> A. Yes.
>
> \*\*\*
>
> Q. [I]f you look at the second to last paragraph on the first page of the [FCE], do you see where it states [']while leaving this clinic the client was observed to utilize her left hand independently to back up and turn her car from the parking spot while her right hand was holding her cellphone?['] \*\*\* Then it goes on to say, [']previously during the day [Rodriguez] stated she was unable to drive with her left hand.['] Do you see that?
>
> A. I do.
>
> Q. It goes on to state, [']also she documented a pain level of 8 to 9 out of a scale of [10] since 12:00 and at the end right before she drove out of the parking lot,['] correct?"
>
> A. I see that.
>
> Q. Now, had you known this would it have changed any of your opinions?
>
> A. Well, that's pretty strong. She was really backing up and talking on the cell phone at the same time? Yeah, you would have to question it."

¶ 66    On redirect examination, Rodriguez's counsel referred to the June 3, 2009, FCE and attempted to ask Dr. Gates to discuss Raven's results. Metra's counsel objected that no foundation had been laid for the document. Rodriguez's counsel then attempted to "review" the FCE with Dr. Gates and sought the court's permission to publish the FCE to the jury "for completeness[;] it was discussed extensively in the cross-examination." The court allowed publication, stating, "Okay. Under the rule of completeness, go ahead, just show the portion, if you want to show it to the jury, just show the portion that's going to complete what was testified to previously, just that portion." Rodriguez's counsel then asked Dr. Gates to discuss that portion of the FCE "regarding Lenora Rodriguez's ability to push/pull after that [FCE]." Metra's counsel then objected, citing Rule 213, and the court called a sidebar.

¶ 67    The court first confirmed with both attorneys that prior to trial, it had reviewed Dr. Cole's evidence deposition with them and made rulings on material that was objectionable under Rule 213. The court then explained that, as before, when one party objects under Rule 213, "[a]ll [the proponent of the testimony] ha[s] to do is show me the 213 responses or the discovery deposition where either the opinion or logical corollary or the basis is being given[,] or if it's a fact question, where the subject matter is disclosed." The following colloquy then occurred.

> "THE COURT: Okay. Show me the 213s where it disclosed that subject matter.
>
> [RODRIGUEZ'S COUNSEL]: Judge, you know that Dr. Gates was not permitted to

get into these because they weren't produced in 213. *** So [Metra's] counsel cross-examined Dr. Gates with the document and went into a lot of different things with this document ***. [H]e opened the door on cross-examination. That's not in my 213s. I have a right to ask the doctor for completeness sake what does the document say because he danced around what the findings were by [Raven] in cross-examining Dr. Gates and made–you know, scored points on cross-examination with this document. On redirect, can't I come back and say what the document really says? It's not in my 213s but it was asked about on cross-examination.

[METRA'S COUNSEL]: I asked about a specific portion of the 6/3/2009 [FCE] limiting it to that portion specifically, and it was the paragraph on page 1, second paragraph from the top [*sic*] of the page, and that's it. That's all I asked him about. *** I don't believe that opens the door to counsel getting to ask questions about the entire document when it wasn't disclosed properly under 213.

THE COURT: Let me see the document. What is it we are talking about?

[RODRIGUEZ'S COUNSEL]: The findings were that she can't push or pull a hundred pounds, that's what I want to ask him.

THE COURT: And what is it that you asked?

[METRA'S COUNSEL]: I asked him about this paragraph right here on the first page (indicating).

\*\*\*

THE COURT [to Rodriguez's counsel]: *** You have an obligation and you know you have an obligation to disclose this opinion and these documents if they are going to be used, and you didn't do it. That's not fair. Now I'm stuck here because you didn't disclose, and I have to try to do justice with this case because you didn't do what you were supposed to do. ***

[RODRIGUEZ'S COUNSEL]: What I want to say is that what counsel did in cross-examination was show [the FCE and] the job requirements for a conductor, and said that [Rodriguez's] lifting and carrying is 10 to 20 pounds, and then he read this portion in and said that [Rodriguez] can lift and carry 10 to 20 pounds. So for completeness sake, what I would like to ask this witness is that the job description also requires pushing 30 to 100 pounds, and in the same document [Raven] said that [Rodriguez] cannot push [100] pounds, that if she has to push [100] pounds, she would require assistance.

\*\*\*

THE COURT: Her movements were inconsistent–that's what my notes indicate, that the questions were just about the observations and the driving, not being able to drive with her left hand, and the pain levels, and I don't see anything about weights, so the completeness is not going to be allowed on this one."

¶ 68   On appeal, Rodriguez contends that the court erred in preventing her counsel from questioning Dr. Gates about the FCE on redirect examination after Metra's counsel "opened the door" on cross-examination, which left the jury with a false impression that Gates believed Rodriguez was capable of returning to work as a conductor. Metra contends that the

court was correct in "ruling that because [Rodriguez] had failed to disclose pursuant to Rule 213(f)(3) that Dr. Gates had reviewed the [FCE], [s]he could not inquire about it on re-direct [*sic*]."

¶ 69    We review a trial court's decision on the propriety of redirect examination for an abuse of discretion. *Shaheen v. Advantage Moving & Storage, Inc.*, 369 Ill. App. 3d 535, 543 (2006). An abuse of discretion occurs when a ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *Sbarboro v. Vollala*, 392 Ill. App. 3d 1040, 1055 (2009).

¶ 70    We must first define precisely what question is before us in this appeal. Contrary to Metra's contention, the court did not rule that Rule 213 bars a litigant from using a previously undisclosed document on redirect examination as a matter of law. Rather, it ruled that under the facts of this case, the rule of completeness did not permit Rodriguez to introduce the FCE notwithstanding her earlier nondisclosure. Rodriguez does not challenge the court's decision to bar her from introducing the FCE in her direct examination of Dr. Gates because she did not disclose it under Rule 213(f). She also does not challenge Metra's use of the FCE in its cross-examination of Dr. Gates on appeal, which was permissible under the plain language of Rule 213(g). Indeed, the court's treatment of Rule 213 objections in Dr. Cole's evidence deposition was an efficient way to address such objections and could be used by practitioners and judges alike as a road map in disposing of challenges under Rule 213. The question before us now is whether the court properly found the rule of completeness inapplicable for the purpose of allowing Rodriguez to use the FCE in her redirect examination.

¶ 71    The rule of completeness provides that when a statement or writing has been admitted into evidence, the remainder of the writing should be admitted in order to put the original statement into proper context and to convey that to the jury. *Herron v. Anderson*, 254 Ill. App. 3d 365, 375 (1993). The additional portion of the writing must relate to the same subject matter as the original and tend to explain, qualify, or otherwise shed light on the meaning of the part already introduced. *Yoder v. Ferguson*, 381 Ill. App. 3d 353, 385 (2008). The additional material is admissible when necessary to prevent the jury from receiving a misleading impression of the nature of the original writing. *People v. Ward*, 154 Ill. 2d 272, 311 (1992). See also Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 106.1 (9th ed. 2009). Nevertheless, application of the rule of completeness is subject to the court's discretion. *Yoder*, 381 Ill. App. 3d at 386.

¶ 72    It is well settled that the rule of completeness may allow a litigant to use previously undisclosed evidence in his redirect examination–even if it had been ruled inadmissible under Rule 213–if the evidence was introduced on cross-examination. See *Bryant v. LaGrange Memorial Hospital*, 345 Ill. App. 3d 565, 577-78 (2003) (holding that counsel opened the door to elicitation of certain testimony that previously had been barred by Supreme Court Rule 213); *Colella v. JMS Trucking Co. of Illinois*, 403 Ill. App. 3d 82, 92 (2010) (quoting *Connor v. Ofreneo*, 257 Ill. App. 3d 427, 434 (1993)); *cf. Stapleton v. Moore*, 403 Ill. App. 3d 147, 165 (2010) (principle also applied where evidence was introduced to explain non-expert witness's testimony).

¶ 73 The transcript reveals that Rodriguez's counsel first attempted to publish the FCE to the jury on redirect on the basis of completeness because it was "discussed extensively in the cross-examination." The court initially allowed counsel to show the jury only "the portion that's going to complete what was testified to previously." However, in sidebar, when Rodriguez's counsel was challenged on what content he intended to clarify, he represented that Dr. Gates was asked if Rodriguez was capable of "lifting and carrying *** 10 to 20 pounds." Counsel also represented that Metra's counsel "read this portion [of the FCE] in and said that [Rodriguez] can lift and carry 10 to 20 pounds." Therefore, Rodriguez's counsel argued that "for completeness sake," he should be permitted to ask Dr. Gates whether the job description also required Rodriguez to push 30 to 100 pounds and whether the FCE concluded that Rodriguez was incapable of pushing 100 pounds without assistance.

¶ 74 Our review of the transcript supports the circuit court's recollection of the testimony based on its notes. When Dr. Gates was cross-examined with the FCE, he was not asked about any specific weights that Rodriguez could lift or carry. Rather, he was asked whether the FCE concluded that Rodriguez "had a higher level of functioning than required to perform her lifting requirements of her job as a conductor" and whether Rodriguez "demonstrated the ability to work as a conductor." Nor was Dr. Gates asked to discuss Raven's conclusions about Rodriguez's ability to push or pull certain weights. The remainder of the cross-examination on the FCE focused on the inconsistencies in Rodriguez's movements, her reported levels of pain, and whether she drove with her left hand when leaving the testing center. When Dr. Gates was questioned about specific weights Rodriguez could lift or carry, it was based on the requirements contained in Metra's job description, which Rodriguez was permitted to question Dr. Gates about. Therefore, the portion of the FCE Rodriguez's counsel sought to introduce would not have explained, qualified, or shed light on the portion of the document already discussed. Nor are we convinced that the jury was in danger of being misled about the nature of the FCE, especially considering that the testimony Rodriguez found objectionable was derived from Metra's job description. The court's unwillingness to apply the rule of completeness here was not arbitrary or unreasonable, but was well justified under the circumstances. Accordingly, we cannot say that the court abused its discretion.

¶ 75                                    III. CONCLUSION

¶ 76 For the foregoing reasons, we find that there was a reasonable hypothesis to support the verdict and it was not irreconcilably inconsistent. Additionally, we find that the verdict was not against the manifest weight of the evidence because there was conflicting testimony regarding the extent of Rodriguez's injury, the nature of the job she sought to return to, and the amount, if any, of her future wage loss. Finally, we find that the trial court did not abuse its discretion in precluding Rodriguez from using the June 3, 2009, FCE in her redirect examination of Dr. Gates based on the rule of completeness.

¶ 77 Affirmed.